THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

**Mailed: August 9, 2011**

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board
————

ZAO Gruppa Predpriyatij Ost *and*
ZAO Ost Aqua

v.

Vosk International Co.
————

Opposition No. 91168423
to Application No. 78485896
filed September 19, 2004

Opposition No. 91169098
to Application No. 78477780
filed September 2, 2004

Opposition No. 91169446
to Application No. 78477812
filed September 2, 2004
————

Oral Hearing: November 4, 2010
————

Carla Calcagno, Calcagno Law PLLC, and Maria Eliseeva
Houston Eliseeva, LLP, for opposers.[1]

Evan Anderson, Patel & Alumit, PC, argued for defendant;
John Alumit was with him on the brief.

**Before Walters,[2] Zervas, and Mermelstein, Administrative
Trademark Judges.**

**Opinion by Mermelstein, Administrative Trademark Judge:**

---

[1] Opposers were represented by several attorneys during the
course of this proceeding.

[2] Administrative Judge James Walsh, who was on this panel at oral
hearing, has retired from Federal service. Judge Walters is
substituted in his place. *See In re Bose*, 772 F.2d 866, 227 USPQ
1, 4 (Fed. Cir. 1985) (TTAB may substitute panel member after
oral argument).

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446


Applicant Vosk International, Co. seeks registration of the following marks on the Principal Register:

| App. No. | Mark | Goods | Translation | Disclaimer |
|----------|------|-------|-------------|------------|
| 78485896 |  | Non-alcoholic beverages, namely flavored sparkling water | The non-Latin characters in the mark transliterate to "DUCHESSE" and this means "DUCHESSE PEAR" in English. | DUSHESSE |
| 78477780 |  | Non-alcoholic beverages, namely sparkling flavored water | The foreign wording in the mark translates into English as estragon, which is an aromatic perennial of southeastern Russia. | ESTRAGON |
| 78477812 |  | Non-alcoholic beverages, namely sparkling water | The foreign wording in the mark translates into English as extra-cider. | |

Each application asserts an intent to use the mark in commerce pursuant to Trademark Act § 1(b), 15 U.S.C. § 1051(b).

Opposers Zao Gruppa Predpriyatij Ost and ZAO Ost Aqua, filed oppositions to registration, alleging prior use of similar marks (discussed below) and that use of applicant's marks on the identified goods "is likely to cause confusion, deception, or mistake." *See* Trademark Act § 2(d); 15 U.S.C. § 1052(d).  By its answer, applicant admitted that the marks at issue are similar, but denied that opposers are entitled to relief, and raised various affirmative defenses.[3]

---

[3] In its answers, applicant raised the defenses of fraud, unclean hands, unlawful use in commerce, and consent.  Because only unclean hands was raised in applicant's brief, the other defenses

2

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

Because they raise common issues of law and fact, the proceedings in these cases were consolidated for discovery and trial, and we decide them in a single decision.

We sustain the oppositions.

## I.   Parties

Opposer Zao Gruppa Predpriyatij Ost is a Russian company which owns and manages several other firms, including opposer Zao Ost Aqua.  Zao Ost Aqua is a Russian company which manufactures and distributes non-alcoholic beverages, including flavored waters and soft drinks of the type at issue here.  *See generally*, Zuev Test. at 8-11. According to opposers, they shipped goods to the United States for distribution first through B & B International Connections, Inc. and later through applicant.

Applicant Vosk International Co., founded in 1977, is a partnership based in Washington state.  Vosk imports and distributes alcoholic and non-alcoholic beverages in the United States.  On March 18, 2004, opposers and applicant signed an agreement ("first contract") under which opposers transferred[4] beverages to applicant for sale in the United States.  The first contract was revised and superseded by

---

are considered waived.  *Cerveceria India Inc. v. Cerveceria Centroamericana, S.A.*, 10 USPQ2d 1064, 1066, n.3 (TTAB 1989).

[4] The parties differ on the appropriate characterization of their transactions under the contracts.

3

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

another agreement signed September 18, 2004 ("second contract").  On September 2 and September 19, 2004, applicant filed the subject trademark applications.

## II.  Record

The record comprises the pleadings and the files of the opposed applications.  Trademark Rule 2.122(b).  In addition, the parties proffered the following evidence during their assigned testimony periods:

### A.  Opposer's Evidence

- Opposer's Testimony:

  - Evgeny Zuev, Deputy General Director of Zao Gruppa Predpriyatij Ost, June 4, 2009 (dkt. 74 & 71).

  - Edward Tkach, President of B & B International Connections, Inc.

    - June 4, 2009 (dkt. 72 & 73).

    - October 19, 2009 (rebuttal) (dkt. 69).

  - Testimony of Patrick D. Gill, J.D., October 19, 2009 (dkt. 82).

- Opposer's Notices of Reliance:

  - Oct. 19, 2009 – dictionary definition (dkt. 63);

  - Oct. 19, 2009 – e-mail from applicant to opposer (dkt. 64) (*Stricken* by order of March 15, 2010).

### B.  Applicant's Evidence

- Applicant's Testimony:

4

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

- o Hrach Voskanyan,[5] President, Vosk International Co. (July 24, 2009) (dkt. 75);

- Applicant's Notices of Reliance:

  - o July 30, 2009 – Dictionary definitions, online publication (dkt. 50);

  - o July 30, 2009 – documents from the file of opposer's Application No. 78587895 (dkt. 51);

  - o July 30, 2009 – documents from the file of opposer's Application No. 78587669 (dkt. 52);

  - o July 30, 2009 – documents from the file of opposer's Application No. 78587835 (dkt. 53);

  - o July 30, 2009 – documents from the file of opposer's abandoned Application No. 76223242 (dkt. 56);

  - o July 31, 2009 – printed publications (dkt. 54);

  - o July 31, 2009 – opposer's responses to applicant's discovery requests (dkt. 55);

  - o August 21, 2009 – "domestic public documents" (dkt. 60).

---

[5] Opposers indicate that applicant served a notice of reliance (dated July 30, 2009) on Mr. Voskanyan's discovery deposition and the Board's previous order on summary judgment. It appears that this notice of reliance was never filed. Applicant states that it does not cite this notice of reliance, "but instead directly refers to the documents of record in these proceeding [sic]," namely, opposers' response to applicant's motion for summary judgment and the Board's October 31, 2008, order denying summary judgment. Resp. to Evid. Obj. at 31. While those papers are part of the record of this case, submissions on summary judgment cannot be relied on as evidence, unless they are properly submitted during trial. *Levi Strauss & Co. v. R. Josephs Sportswear Inc.*, 28 USPQ2d 1464 (TTAB 1993). Moreover, the Board's order denying summary judgment is of little relevance because it did not resolve any issue.

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

### C.   Evidentiary Objections

Prior to considering the parties' objections, we find it necessary to note the state of the record submitted by the parties.  The three principal witnesses in this case are native Russian speakers, and their testimony was given primarily in Russian, through interpreters.  Unfortunately, neither party employed an interpreter with experience in depositions,[6] and the resulting interpretation is anything but transparent.  The testimony of both parties was marked by interruptions and misunderstandings about interpretations, and in some cases the court reporter noted discussion between the witness and the interpreter in Russian, which was not interpreted for the record.

Unsurprisingly, both parties rely on documents in Russian.  A few documents were translated prior to being proffered in evidence, but some were not.  Instead, in several cases, the party offering the document had the witness "read"[7] selections from the document in Russian, to

---

[6] Applicant's interpreter admitted that he had never before interpreted at a deposition.  The testimony of opposer's witnesses was interpreted by one of opposer's own attorneys who is also a native Russian speaker, although her qualifications as an interpreter are not a matter of record.  *See* Fed. R. Evid. 604 (interpreters are subject to qualification as experts).

[7] The word is in quotation marks because on at least a few occasions, it was not clear whether the witness was reading the document verbatim, summarizing its contents, or simply testifying about the document.  *See infra* n. 18 and accompanying text.

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

be interpreted as the witness spoke.[8]  The result hardly leaves us with a clear or authoritative understanding of many of the documents which were offered in evidence.[9]  Nonetheless, neither party clearly objected to this state of affairs and we are left to make the best we can of this record.

This has been a contentious and acrimonious proceeding. There were many unresolved discovery issues, and during trial the parties frequently appear to have lost focus on the narrow question before us in favor of tangential issues. As will be seen, many of these problems could or should have been resolved earlier or avoided.

The parties each made and preserved numerous and extensive objections to evidence proffered by the other in their briefs, in appendices to their briefs, and in separate motions.  We assume familiarity with the evidence and objections and, for the most part, consider them summarily.

---

[8] Applicant's own interpreter pointed out on the record that one problem with this method is that there is a difference between spoken and written language: "So I am translating the way [the witness] speaks or read [sic] the document....  And if I had to translate that document into written language, it probably would sound slightly differently [sic] from what I hear."  Voskanyan Test. at 47.

[9] And as will be seen, some of the documents were not translated at all.  These documents will not be considered.  *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1405 (TTAB 1998) (objections sustained as to documents not in English).

7

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

1. **Opposer's Objections (Appx. A to Opposer's Brief)**

a. Applicant's July 30, 2009, notice of reliance on dictionary definitions for "duchesse" and "estragon."  Objection overruled because the meaning of the marks is relevant in a likelihood of confusion analysis.[10]

b. Applicant's July 30, 2009, notices of reliance on copies of Opposer's applications to register label designs.  Objection overruled because opposer's pending applications are relevant to the issue of opposer's standing.

c. Applicant's July 31, 2009, notice of reliance on printed publications and related testimony of Edward Tkach.

Mr. Tkach is not a party to this proceeding or an employee of a party.  He is President of B & B which imports food and drink products from Russia.  Mr. Tkach testified that he imported products bearing opposers' marks into the United States prior to applicant's entry into this story, so his testimony is important to opposers' claim of priority.

Opposers called Mr. Tkach to testify during their case

---

[10] However, this evidence is of very little practical value because the marks at issue are virtually identical in relevant part.  Regardless of what the words in the mark may signify, it is clear that they signify the <u>same</u> thing in both opposers' and applicant's mark.

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

in chief.  During cross-examination, applicant proffered
what appears on its face to be a 2003 news release from the
Food and Drug Administration ("FDA"), which stated that B &
B had imported tainted milk into the United States, and that
the milk was the subject of a recall.[11]  Tkach Test. exh.
13.  Opposer's counsel objected to the news release and
applicant's questions about its contents, and ultimately
directed Mr. Tkach not to answer.[12]  Tkach Test. at 32-34,
exh. 13.

Applicant argues "that distributing tainted milk to the
consuming public casts doubt on a witness's character for
truthfulness if done so with knowledge of the contamination,
as the witness could have either hid the knowledge or
willfully disregarded what it should have known."  App. Br.

---

[11] According to the press release, "[t]he recall was initiated
after sampling by New York State Department of Agriculture and
Markets Food Inspectors revealed the imported products contained
sulfonamide, a drug prohibited for use in lactating dairy cattle
and food producing animals."

[12] Following Mr. Tkach's first testimonial deposition, applicant
filed under a notice of reliance on several more brief news items
regarding the milk recall and two other incidents from
approximately the same period in which fruit preserves and
preserved herring imported by B & B were purportedly recalled.
App. NOR (July 31, 2009).  These documents were alleged to be
admissible under Trademark Rule 2.122(e), and were submitted "as
an offer of proof that had the witness not been instructed to
answer Applicant's questions on cross-examination, the Board
would have learned that the witness's character for truthfulness
would be in question, as the witness has a long history of
distributing harmful products to the American public, including
misbranded products and contaminated food."  App. NOR (July 31,
2009).  Opposers timely objected to the admission of these
articles during briefing.

9

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

at 17.

We disagree.  The proffered press release and news articles, *see* n.12, are hearsay, and are not admissible to prove the truth of the matters asserted therein.  Fed. R. Evid. 802; *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1117 n.7 (TTAB 2009) (citing *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1717 n.2 (TTAB 2007)).  But even if they were not hearsay, we note that none of the articles mentioned Mr. Tkach by name or suggested that he (or B & B) were charged with or convicted of a crime in connection with the incident, that he (or B & B) actually knew of the alleged problems with the identified products before distributing them, that he (or B & B) attempted to hide the problems, or that he (or anyone else at B & B) lied about them after they were discovered.  The articles neither provide a foundation nor basis for applicant's questions nor do they raise any question about Mr. Tkach's reputation for truthfulness.  Applicant's "offer of proof" regarding Mr. Tkach's allegedly poor character for truthfulness fails, first because the documents cannot prove the truth of the matters asserted and second, because even if considered as true, they do not reflect poorly on Mr. Tkach's character for truthfulness.

Moreover, we find no error in opposers' counsel's

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

objection to this line of questions and her instructing Mr.
Tkach not to answer them.[13]   Cross-examination is not a
free-for-all in which anything is allowed in an attempt to
suggest that a witness is a liar or of bad character.   The
Federal Rules strictly limit this type of evidence because
of the need to "protect witnesses from harassment or undue
embarrassment," Fed. R. Evid. 611(a)(3), because even if
probative, it presents a risk of unfair prejudice and
confusion of the issues, Fed. R. Evid. 403, and because it
is often simply a waste of time, Fed. R. Evid. 611(a)(2).[14]

     Here, there is nothing to suggest that Mr. Tkach has
been convicted of a crime, Fed. R. Evid. 609, or that the
sale of allegedly recalled milk (or any other product) by
his company is probative of his general character for

---

[13] Instructing a witness not to answer a question should only be
done under unusual circumstances, Fed. R. Civ. P. 30(c)(2), and
if found to be unjustified, may give rise to an adverse inference
based on the information sought and withheld.   *See Health-Tex
Inc. v. Okabashi (U.S.) Corp.*, 18 USPQ2d 1409, 1411 (TTAB 1990).
While opposers did not seek a protective order regarding these
questions, Fed. R. Civ. P. 30(d)(3)(A), they did the equivalent
by arguing in response to applicant's motions and briefing that
this line of questioning was improper, and subjected Mr. Tkach to
embarrassment and harassment.

[14] The tribunal "shall exercise reasonable control over the mode
and order of interrogating witnesses and presenting evidence."
Fed. R. Evid. 611(a).   Despite the absence of a Board official at
testimonial depositions, the Board expects parties and counsel to
conduct proceedings with decorum and courtesy, Trademark Rule
2.192, and in accordance with the principles set out in the
applicable rules.

Exhibit B - Page 31

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

truthfulness[15] or of the truthfulness of his particular
testimony in this matter, Fed. R. Evid. 608(b).  This
proceeding is a dispute between opposers and applicant about
the registration of disputed trademarks.  It is not a trial
of Mr. Tkach regarding possible wrongdoing in long-past and
unrelated incidents involving other goods manufactured by
other companies and sold under different marks.  This line
of questioning was therefore irrelevant, a waste of time,
and presented a high risk for prejudice and the
embarrassment or harassment of a non-party witness.  We
therefore SUSTAIN opposer's objections to the admission of
the articles and to applicant's questioning of Mr. Tkach
about the milk incident.

     **d.**  Applicant's August 21, 2009, notices of
reliance on responses by the FDA to applicant's FOIA
requests indicating (1) that the FDA found in its records no
packaging permits issued to B & B "pursuant to 37 CFR
section 108.5, 108.12, 108.25." and (2) showing "refusal

---

[15] Applicant argues that if it had been able to question Mr. Tkach
about the tainted milk and similar incidents, it might have been
able to establish that Mr. Tkach personally knew about the
unsoundness of his products prior to sale or that he hid evidence
of such incidents after the fact, and that this would tend to
imply that Mr. Tkach is not generally of truthful character, and
that in turn would tend to imply that his testimony in this
proceeding should be doubted.  App. Br. at 17.  But this is all
speculative (as noted the proffered articles do not provide any
support for this theory), and its connection with the facts of
this proceeding is highly attenuated.

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

data relating to beverages imported by" opposers.[16]

Opposers object to the FOIA response purporting to show that B & B had not been issued a packing permit, because the listed regulations do not exist.  We agree – there are no regulations at 37 CFR 108 (or subheadings thereof).  Although applicant alleges that the FDA's reference to "37 CFR" was a typographical error, and should have read "21 CFR," we can not be sure from the agency's report what was searched.  We will not presume (as applicant urges us to) from such flawed evidence that opposers were engaged in illegal activities or that "Tkach lied in sworn testimony about possessing a packing permit, and that therefore his character for truthfulness is in question."  Resp. to Evid. Obj. at 30.  We sustain the objection.

Opposers also object to the "refusal data" on a number of grounds, all of which go to the weight to be afforded this evidence, not its admissibility.  Objection overruled.

     **e.**  <u>Zuev Deposition</u> Exhibits 14-22.  These documents (all in Russian) were marked by the court reporter at the request of applicant's counsel during the cross-

---

[16] This document is in the form of a table briefly listing (so far as is relevant here) 14 "charges" relating to what appears to be one or possibly two 2008 shipments of "CARBONATED SOFT DRINK TARKHUN."  ("TARKHUN" is apparently Russian for estragon.)  All of the charges appear to relate to various deficiencies in the labels affixed to the goods.

Exhibit B - Page 33

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

examination of Mr. Zuev.  Opposers' objections to these documents are sustained.  The witness did not identify any of the documents,[17] and the basis for their admissibility is unclear (as is their meaning, since no translation was provided).

      **f.**   <u>Tkach Deposition</u> Exhibit 12.  Opposers' objection is overruled as to Exhibit 12, which the witness identified as similar to the packaging of shipments from opposers.

      **g.**   <u>Voskanyan Deposition</u>: **(i)** P. 34:5-8 – Mr. Voskanyan testified that mutual friends of applicant and opposers negotiated an agreement to allow applicant to register the subject marks.  Objection sustained – applicant concedes that this is inadmissible hearsay.  **(ii)** Pp. 61-62 – objection sustained as hearsay to the extent the witness stated the products contained "Patent Blue V."  **(iii)** Pp. 43-47 – objection sustained to the extent that the witness testified as to what is or is not legal to import under U.S. law.  **(iv)** Exhibit 9 – objection sustained to the extent it

---

[17] Mr. Zuev positively stated that he did not recognize exhibits 14-15 and 17-22.  Applicant argues that Exhibit 16 was "authenticated by the witness."  Resp. to Evid. Obj. at 31.  In fact, Mr. Zuev was shown Exhibit 16 and asked "if [he had] ever seen this document before?"  His answer was "Yes," Zuev Test. at 67, but there were no further questions or answers.  It is quite clear that Mr. Zuev did not identify, let alone authenticate this document.  Fed. R. Evid. 901.

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

is offered for the truth of the matter asserted, otherwise denied. **(v)** Exhibit 10.  This document is a letter in Russian from applicant to opposers.  Mr. Voskanyan identified the document and testified generally as to its contents.  We sustain opposers' objections.  Applicant argues that the document "was offered into evidence so that the witness … could testify <u>as to its contents</u>. … The witness need not read the document into the record word for word, but can <u>summarize its contents</u> based on his own refreshed recollection."[18]  Resp. to Evid. Obj. at 33 (emphasis added).  Applicant is incorrect.  Mr. Voskanyan did not read the letter (to be interpreted as he spoke). Instead, he testified <u>about</u> its contents.  Such testimony was hearsay, Fed. R. Evid. 802, and in any event, oral testimony may not be used to prove the content of the document, Fed. R. Evid. 1002.  While the letter itself might have been admissible if it were proffered with an accurate translation, there is no translation in the record.  *Hard Rock Cafe*, 48 USPQ2d at 1405.  **(vi)** Exhibit 11.  This document is another letter from applicant to opposers,

---

[18] The fact that applicant used the document to refresh its witness's recollection is not a basis for its admission in evidence, although the *adverse party* may, at its option, inspect or introduce a document used to refresh the witness' recollection.  Fed. R. Evid. 612.  Here opposers did not opt to introduce the document, and in fact objected to it.

15

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

although this one is accompanied by a translation.  This document is admissible but cannot be relied on to prove the truth of the matters asserted in it.  **(vii)** Exhibit 14 – Objection sustained, as conceded by applicant.

**(viii)** Exhibits 18 & 19 – These documents are respectively, a May 18, 2005, letter from the FDA to applicant, stating that a shipment of opposers' ESTRAGON product (imported by applicant) was detained, and applicant's June 5, 2005, response to the FDA's letter.  Opposers objected to both letters as hearsay, and to the latter in that it is not certified.  Applicant responds that the FDA letter is offered only "to show that Voskanyan received a letter from the FDA informing him that the Estragon beverage was detained….  It is not offered to prove the truth of the matter asserted…."  Resp. to Evid. Obj. at 33.  Mr. Voskanyan's response to the FDA was "offered to show that Voskanyan responded to the FDA letter…" and also to show Mr. Voskanyan's lack of prior knowledge about any problem with the detained product.  Opposers' objection is sustained to the extent that the letters are offered to prove the truth of any matter asserted in them (*e.g.*, applicant's knowledge about opposers' product), and is otherwise denied.[19]

---

[19] Opposers' objection on the ground that Exhibit 19 is not certified as a record of the FDA is overruled.  This document

16

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

**(ix)** Exhibit 20 – This document is an invoice "offered to show that Applicant hired a broker to warehouse the beverages that were rejected by the FDA during the three months before their destruction…." Opposers' hearsay objection is sustained to the extent the exhibit is offered to prove the truth of the matters asserted therein.[20]

**(x)** Exhibit 21 – This document appears to be a June 9, 2005, letter from the FDA to applicant regarding a shipment of opposers' product (apparently in response to applicant's Exhibit 19). Opposers object on the ground that the document is not certified. Opposers' objection is apparently a reference to Fed. R. Evid. 902(2), which deals with the authentication of official documents not under seal. Mr. Voskanyan testified from his personal knowledge that he received this letter. Voskanyan Test. at 64-65. We will consider this document to show that such a letter was received, but because it has not been proven to be an official record, we will not consider it to prove the truth

---

appears to be a letter written by Mr. Voskanyan to the FDA, which Mr. Voskanyan confirmed in his testimony. Voskanyan Test. at 57. Such documents need not be certified.

[20] We note, however, that this document does not include any mention of the facts for which applicant asserts that it was offered, *see* above, or those facts for which opposers fear it is offered (*i.e.*, to prove that opposers' product contained unapproved ingredients). It appears to be a customs warehouse invoice, but it does not specifically identify the products which were warehoused, let alone why they were warehoused.

17

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

of anything stated in it.   **(xi)** Exhibit 13 – Opposers object

to this exhibit as hearsay.   According to applicant, this

exhibit

> is an email communication sent by an employee of
> Opposer Ost-Aqua to the witness, Voskanyan, in which
> the employee of Opposer acknowledged that it was
> informed by a company it hired that the Estragon
> beverage did contain Patent Blue V.  It is not an out-
> of-court statement, and if it were, would be an
> exception to the hearsay rule as an admission by a
> party opponent.

App. Resp. to Evid. Obj. at 34.   Opposers do not deny that

the e-mail was sent by its employee or provide any further

information or argument on this issue.   Applicant is plainly

wrong in arguing that this exhibit is "not an out-of-court

statement," as it is a statement which clearly was not made

in court (i.e., during the course of testimony).   However,

we agree that because it constitutes a statement by

opposers' employee on a matter on which there is no

indication was not within the scope of her employment, it is

an admission, and by definition, not hearsay.   Fed. R. Evid.

801(d)(2).   Nonetheless, what is "admitted" is less than

what applicant alleges.   This e-mail states only that

opposers had no knowledge of the alleged problem with "Blue

Patent V E 131" prior to applicant bringing it to opposers'

attention, that opposers obtain the Estragon flavoring from

another company, Wild Rossiy (or Wild Russian), and that an

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

after-the-fact analysis by another company indicates that the Estragon product contains E 131.

    2.    **Applicant's Evidentiary Objections (Appendix B to Applicant's Brief)**

    a.    <u>Motion for Estoppel Sanction</u>.  On January 27, 2010, applicant filed a motion to strike Exhibit 11 to the Tkach testimony,[21] as well as part or all of the Tkach and Zuev testimony regarding this exhibit and other matters "under the doctrine of Equitable Estoppel because these documents were not produced in discovery … [and] because these witnesses were not identified as persons having any discoverable information."  Mot. at 25.  Although the motion was extensively briefed,[22] decision was deferred until final decision.  Order (Mar. 15, 2010) (by the same order, the Board granted applicant's separately-filed motion to strike opposers' notice of reliance of October 19, 2009).  We deny applicant's motion.[23]

---

[21] Mr. Tkach testified that Exhibit 11, comprising 39 pages and submitted under seal, is a report showing B & B's inventory of opposers' branded product which B & B imported between January 1, 2002, and August 31, 2008.

[22] Applicant's motion ran to 25 pages.  Its reply brief – at 14 pages – exceeds the applicable page limit, and has accordingly not been considered.  Trademark Rule 2.127(a) ("A reply brief shall not exceed ten pages in length in its entirety."); *Ron Cauldwell Jewelry Inc. v. Clothestime Clothes Inc.*, 63 USPQ2d 2009, 2010 (TTAB 2002) (reply brief not considered).

[23] We do not specifically discuss each of the discovery requests and arguments set out in applicant's lengthy motion.  Suffice it

Exhibit B - Page 39

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

An estoppel sanction (or equitable estoppel) in some circumstances prevents a party from relying at trial on evidence that was withheld during discovery. *See generally* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 527.01(e) (3[th] ed. 2011). Estoppel sanctions are not automatic; much depends on factors such as what the inquiring party sought during discovery (and how), what responses were made, and any ensuing actions.

According to its motion, applicant served discovery requests in 2006 and early 2007 with respect to the DUCHESSE and EXTRA-CIDER marks,[24] seeking specific information regarding opposers' priority and other matters. In response, opposers objected to the discovery on a variety of grounds, provided little information, and, applicant argues, never disclosed key facts or the identity of key witnesses – particularly relating to the issue of opposers' priority. No responsive documents were sent to applicant at the

---

to say that we have considered them all, but we do not find that any merit the imposition of sanctions.

[24] Applicant believes that it served discovery with respect to ESTRAGON, although (in contrast to discovery regarding the other marks) it appears that opposers never responded in any way. Applicant admits that it "cannot prove [the ESTRAGON discovery requests] were served," and that "[n]o Motion to Compel was filed." Mot. at 4; *see* Response at 2. No estoppel can apply to the "failure to respond" to this ESTRAGON discovery, because applicant admittedly cannot show that it was served. Mot. 4.

Exhibit B - Page 40

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

time.[25]  Applicant alleges that "[o]pposers did not

supplement any of its discovery responses prior to taking of

testimony on June 4, 2009, nor provide any forewarning to

Applicant of the new exhibits to be introduced in

testimony."  Mot. at 7.  Applicant claims that due to

opposers' discovery responses – or lack thereof – it had

reasonably concluded that opposers either had no such

evidence or if they did, that they would not rely on it at

trial.  *Id*.  As a result, applicant says it was surprised

when it received the notice of deposition for the testimony

of Edward Tkach, and likewise by his testimony and the

documents proffered during his deposition (as well as parts

of Mr. Zuev's testimony).

    Opposers paint a very different picture.

    For one thing, opposers argue that applicant

misinterprets its own discovery requests as requesting more

than they did in fact.  For instance, applicant complains

---

[25] As a courtesy, in Board proceedings parties will typically make
and serve copies of any responsive documents along with their
response to discovery requests.  Nonetheless, a party responding
to a request for production is not required to do so.  *No Fear
Inc. v. Rule*, 54 USPQ2d 1551, 1555 (TTAB 2000); *see* Trademark
Rule 2.120(d)(2) ("The production of documents ... will be made
at the place where the documents ... are usually kept, or where
the parties agree....").  A proper response need only either
object to a request for production or state that "inspection [of
the documents] will be permitted."  Fed. R. Civ. P. 34(b)(2)(B);
*see also* Fed. R. Civ. P. 33(d)(2) (party opting to respond to an
interrogatory by producing business records must give "the
interrogating party a reasonable opportunity to examine the
identified records.").

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

that the identity of opposers' witnesses Tkach and Zuev were
not disclosed prior to trial, and that their testimony
should therefore be stricken.  One of the interrogatories
applicant relies on requested the identity of "the current
and former officers, employees, and agents of Respondent who
are most knowledgeable as to the facts and/or issues
involved in the instant proceeding."  Interrog. No. 1 (Mot.
at 11, 14).  Opposers objected to this interrogatory, *inter
alia*, on the grounds that the question was vague, ambiguous
and overbroad, but they also provided the identity of two
people, neither of whom was called as a witness.  Applicant
now argues that the identity of Tkach and Zuev should have
been disclosed pursuant to this interrogatory, and that
having been withheld, the testimony of both men should be
stricken.

    Opposers note that they objected to the interrogatory,
and it is likely that there was at least some merit to the
objections.[26]  Moreover, opposers argue that Tkach and Zuev
were in fact <u>not</u> the "most knowledgeable" persons, and

---

[26] The interrogatory uses the term "Respondent," although the
parties on whom the interrogatories were served are opposers or
plaintiffs, not respondents.  But assuming it was clear that
applicant meant to say "opposers," there are other problems.  For
instance, it is unclear in this context how opposers were
expected to determine who among the persons possessing any
discoverable information was the *most* knowledgeable, and whether
the interrogatory sought the name of the single most

22

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

applicant's motion does not allege that they were *more* knowledgeable than the persons who were named in opposers' response.

What applicant's interrogatory did <u>not</u> request was the identity of the witnesses opposers intended to call at trial, although that is clearly how applicant would have us interpret it.[27] We will not sanction opposers for their failure to answer a question that wasn't asked.

Moreover, contrary to applicant's arguments, opposers unequivocally state that they did in fact provide numerous relevant documents to applicant long before trial, and that applicant's claim that it was misled to believe that opposers had no such documents has no basis. According to the declaration of Carl Oppedahl, former counsel for opposers, on December 22, 2006, opposers served 824 Bates-numbered pages of documents on applicant. Opposers further

---

knowledgeable person or some unspecified number of knowledgeable people.

[27] Even if the interrogatory had requested opposers' witnesses, applicant would not have been entitled to them. Trademark Rule 2.121(e) now requires pretrial disclosure of the identity of witnesses, the general topics on which they will testify, and the types of documents which may be introduced. However, that rule is applicable only to proceedings commenced on or after November 1, 2007. 72 Fed. Reg. 42,242 (effective date). In this regard, this case, which was commenced prior to that date, is subject to the practice in place prior to the amended rule, which did not require disclosure of witnesses and provided that the identity of the witnesses a party intends to call or the specific evidence it intends to present is <u>not</u> discoverable. *E.g., Time Warner Entm't*

Exhibit B - Page 43

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

state that on June 20, 2008, they "served on [a]pplicant a chart summarizing [their] U.S. sales for each of the opposed marks, by unit and dollar volume for the years 2002-2006, and disclosing, by year, the name of all of its U.S. distributors." Resp. at 5.  Opposers point out that applicant admitted in a discovery deposition that it received documents from opposers, alerting applicant to opposers' prior shipments of beverages to B & B.[28]

While the details are unclear, it would appear that opposers did in fact tender relevant documents, although they were not required to copy and mail them to applicant. Applicant cannot now claim that it is surprised to learn of their existence or that opposers should be estopped from relying on them or the information in them.

Applicant also notes opposers' objection to some of its discovery requests as being "immaterial, irrelevant," and argues that, having allegedly withheld information on these

---

*Co. v. Jones*, 65 USPQ2d 1650, 1657 (TTAB 2002); *compare* TBMP § 414(7) (2d ed. rev. 2004) *with* TBMP § 414(7) (3d ed. 2011).

[28] Opposers quote the following passage from the March 2007 deposition of Mr. Voskanyan:

> Q:   Have you heard of OST shipping DUSHESSE beverages to a company called B&B before Vosk?
>
>      . . .
>
> Mr. ALUMIT: YES
>
> A:   Yeah.
>
> Mr ALUMIT:  He saw it from documents produced.

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

grounds during discovery, opposers should not now be permitted to introduce responsive information or documents at trial.  Mot. at 18 (citing *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 204 USPQ 820 (CCPA 1980)).

Here, for example, is one of the complained-of objections in its entirety:

> Opposers object to this Interrogatory to the extent it is vague and ambiguous.  Opposers also object to the Interrogatory to the extent it seeks information on sales and distribution outside the United States and therefore is immaterial, irrelevant, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Opposers further object to this Interrogatory to the extent it seeks information and/or documents that contain confidential or proprietary information.  Subject to and without waiver of the foregoing objections, Opposers state that they began selling the goods identified in application Serial No. 78/587,835 in the United States on or about November 2000 and, upon entry of a suitable protective order, Opposers shall produce documents pursuant to Fed. R. Civ. P. 33(d) in response to this Interrogatory.

Resp. to Interrog. 7 (Mot. at 12).

As can be seen, opposers did not simply object on the ground that all responsive material was "immaterial [or] irrelevant."  Rather, opposers objected *to the extent that* responsive information met any of several disjunctive and possibly overlapping objections, so it is impossible to determine the ground for withholding any particular information.  The interrogatory requested information about opposers' sale or distribution of the goods for each of the

25

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

years 2000-2006.  Mot. at 12.  Again, while opposers'
objections were themselves confusing, some of them may have
had merit.  Nonetheless, opposers provided some information
and stated that responsive documents would be made available
once a protective order was entered.

In *Weiner King*, which applicant relies on, the
respondent unequivocally refused to provide any information
in response to interrogatories, stating that "findings of
fact and conclusions of law [in a prior proceeding between
the parties] ... render the information requested ...
totally irrelevant and immaterial."  The court construed
this response as respondent's representation that it would
rely solely on the findings of fact and conclusions of law
in the prior case, rather than introduce any additional
evidence before the Board, and thus found that petitioner
was unfairly surprised when respondent later sought to
introduce such evidence at trial.  *Weiner King*, 204 USPQ at
828.

By contrast, opposers here objected "to the extent,"
for example, that the requested information was vague,
ambiguous, immaterial, irrelevant, burdensome or was overly
broad, and on the basis of confidentiality.  Some or all of
these objections may have been the basis for withholding
various items of responsive information, and some or all of

26

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

the information may have been validly withheld.  But –
unlike in *Weiner King* – opposers never refused to provide
properly requested responsive information nor did they imply
in any way that such material did not exist, or would not be
relied upon at trial.  To the contrary, they provided some
information and stated that other documents would be made
available.  That was clearly not the case in *Weiner King*.

Regarding Tkach Exhibit 11, opposers also note that Mr.
Tkach is the president of B & B, a company that is not
related to opposers.  "Exhibit 11 is B and B International's
internal accounting report of its inventory," showing B &
B's inventory of opposers' goods in the United States
beginning in 2002.  Resp. at 9.

Requests for production of documents can only be served
on a party to the proceeding,[29] and are only proper to the
extent that the requested documents are "in the responding
party's possession, custody, or control."  Fed. R. Civ. P.
34(a)(1).  Courts have defined control "not only as
possession, but as the legal right to obtain the documents
requested upon demand."  *Pioneer Kabushiki Kaisha v. Hitachi
High Tech. Am. Inc.*, 74 USPQ2d 1672, 1679 (TTAB 2005)
(citing cases and authorities).  The inquiry is highly fact-

---

[29] Documents may be obtained from a non-party by means of a
subpoena *duces tecum* issued by the appropriate U.S. district

Exhibit B - Page 47

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

specific, but documents in the possession of a party's attorney, insurer, related company, or expert witness have on occasion been found to be in the control of the party. *Id.* Here, opposers argue that they did not have possession, custody, or control of Exhibit 11, nor did they have any legal right to demand the document from B & B. "In fact, [opposers] did not even know the document existed until the eve of Tkach's deposition." Resp. at 9.

We find nothing in the record to support a finding that Exhibit 11 was in the possession, custody, or control of opposers prior to its introduction into evidence. There is no indication that opposers had prior physical possession of the document, or that Mr. Tkach or B & B could have been legally required by opposers to give it to them. Rather, the record supports opposers' contention that B & B is a separate company and that Mr. Tkach is its employee. Clearly there was a business relationship between opposers and B & B, and it seems that Mr. Tkach thinks well enough of opposers to testify on their behalf – apparently without a subpoena. But that is far from saying that opposers were legally entitled to demand that B & B turn over its records.

To be perfectly clear, we do not condone opposers' discovery responses. As was the case with applicant's

court. *See generally* TBMP § 404.03(a)(2) (3d ed. 2011).

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

requests, opposers' responses raise a number of potential problems which are apparent on their face.  Nonetheless, applicant did not file a motion to compel more complete responses or to test the validity of opposers' objections, *see* Trademark Rule 2.120(g); Fed. R. Civ. P. 37(a)(3), and the time for resolving discovery disputes is long past.  *See* Trademark Rule 2.120(e) (motion to compel must be filed prior to the opening of testimony).  Nor did applicant seek entry of a protective order if the parties could not agree to stipulated provisions.[30]  *See generally* TBMP § 412 (2d

---

[30] Applicant cites *Super Valu Stores Inc. v. Exxon Corp.*, 11 USPQ2d 1539 (TTAB 1989), in which the Board said "a party may not refuse to furnish information in response to a discovery request on the ground of 'confidentiality,' ... and then introduce evidence on such matters during its trial period."  *Id.* at 1543.  Nonetheless, the decision makes clear that what was referred to in the quoted passage as "confidentiality" is actually "privilege," *see id.* at 1543 (Exxon's objection on the ground of "attorney-client and work product privilege"), and the difference is important.  Except in unusual circumstances, when a *privilege* is asserted, it bars discovery of the covered information, and is basically an assertion that such matters will not be disclosed at all.  Thus, a party cannot assert a privilege in discovery then waive the privilege to use the information at trial.

On the other hand, a party asserting *confidentiality* is concerned that sensitive information may end up in the wrong hands.  But confidentiality is rarely an absolute bar, and parties in Board proceedings routinely exchange confidential information and use it at trial once a protective order is in effect, and opposers here stated that responsive documents would be made available once such an order was entered.  Unlike the case in *Super Value Stores*, opposers never refused to provide such information, nor did they take a contrary position by waiving confidentiality at trial (by then it was automatically covered by the Board's standard confidentiality order).  Thus applicant had no reasonable basis to believe that information asserted to be confidential would not be used by opposers at trial.

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

ed. rev. 2004).  Even after the amendments to the Trademark
Rules which resulted in the Board's standard protective
order being applicable in this case, applicant apparently
did not request inspection and copying of the responsive
documents which opposers repeatedly said *would be permitted*.

A party seeking discovery must take positive steps to
pursue that goal, even when the responding party appears
recalcitrant in its responses.  When responses are received
comprising various objections going both to the form and
substance of the discovery, it acts at its own peril when it
elects to do nothing and presume that either there is no
responsive information or that such information will not be
introduced at trial.  Estoppel sanctions are sometimes
available to remedy cases in which allowing the introduction
of evidence would be unfair.  But they are not simply an
alternative to properly seeking discovery in the first place
and taking steps to follow up, if it appears that is
necessary.[31]

Imposition of an estoppel sanction is not automatic,
and may be "unduly harsh" in circumstances where there has

---

[31] This case illustrates the problems that arise when discovery
issues are not resolved during discovery.  There are certainly
cases in which it is impossible to do so because there is no
indication that the responding party has or might use requested
information which has not been disclosed.  But that was clearly
not the case here.

30

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

been no "unequivocal[] refus[al] to provide the requested information." *Vignette Corp. v. Marino*, 77 USPQ2d 1408, 1412 (TTAB 2005) (declining to apply sanction). Here, there were a variety of problems with applicant's discovery requests, which were objected to, although opposers never refused to provide discovery. Although the objections themselves may have been problematic, once they were served, the ball was in applicant's court to follow up, but it did not do so. It is too late to see whether applicant would have been able to prevail on a motion to compel discovery; what applicant seeks here is a <u>sanction</u>, and a very serious one at that, since trial and briefing is already complete. Under the circumstances, a movant should clearly show entitlement to such relief, and we find that applicant has not done so.

> **b.** <u>Tkach Testimony</u> p. 10:1-25 (and other testimony regarding B & B's importation of opposers' goods prior to applicant's). Mr. Tkach testified that he had been importing opposers' goods into the United States since 2001. Opposers' counsel continued:

> Q. How did you know that it was 2001 that you started importing?

> A. How do I know? Because I still have the agreement between us and Ost Aqua. We can read it. It's the date.

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

Q.   Were you the one who negotiated with Ost Aqua in
     2001?

A.   No.  It was my brother, Alex.  He was involved in
     the business at the time.

Q.   So you were basing it on a corporate record that
     you had in front of you?

A.   Yes.

Applicant did not object to the testimony at the time,
but now argues that it "should be stricken because it relies
on a hearsay document," citing Fed. R. Evid. 802, because
there was no foundation that "the alleged agreement was kept
as a record ... in the course of a regularly conducted
business activity," citing Fed. R. Evid. 803(6), and because
the witness "has no first hand knowledge of the making of
this alleged agreement," citing Fed. R. Evid. 602.

Applicant's objections are overruled.  Applicant waived
its objections by failing to raise them when the testimony
was proffered, *Pass & Seymour, Inc. v. Syrelec*, 224 USPQ
845, 847 (TTAB 1984) (hearsay and foundation objections
waived); Fed. R. Civ. P. 32(d)(3)(A)-(B), but in any event
they are unavailing.  The objection here is to Mr. Tkach's
*testimony* about when B & B began importing opposers'
goods,[32] not to admission of the agreement which he

---

[32] This differs from Mr. Voskanyan's testimony about Exhibit 10,
which we have stricken.  Unlike Mr. Voskanyan's testimony, Mr.
Tkach was not asked, and did not testify, *about the document*.
Rather, Mr. Tkach testified about the beginning of his business

32

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

indicated would back up his assertion.  While the agreement itself might or might not have been hearsay, its admissibility is not in question because it was not offered in evidence.  Our reading of the witness' testimony is that he testified as to his personal knowledge of the facts, rather than testifying to what the agreement said.[33]

  **c.** <u>Tkach and Gill Rebuttal Testimony</u>. Applicant declares – without explanation or citation – that "the second testimonial deposition of Edward Tkach and the deposition of Patrick Gill are not of record."  Applicant is mistaken.  *See* Tkach Test. (Oct. 19, 2009), filed Dec. 28, 2009, dkt. 69; Gill Test. (Oct. 19, 2009), filed Dec. 28, 2009, dkt. 82.  Objections overruled.

  **d.** <u>Objections to qualifications of opposers' expert</u>.  During rebuttal, opposers presented Patrick Gill as an expert on matters relating to the requirements for importation of goods into the United States.  Mr. Gill's qualifications were put on the record, Gill Test. at 4-10, exh. 2, and opposers' counsel moved for his admission as an expert.  Applicant did not object or

---

with opposers, and when asked, said that the agreement would support his recollection.

[33] It is not clear from the transcript whether the witness had possession of the agreement during his testimony.  But if he did, there is nothing wrong with a witness using a document to refresh

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

question Mr. Gill regarding his qualifications, either then or during cross-examination.  The objections applicant now raises are based on Mr. Gill's apparent unfamiliarity with certain terms applicant claims are important in this area of law.  Applicant's objections should have been made at the deposition, when opposers would have had an opportunity to clear up any question as to Mr. Gill's competency as an expert.  Trademark Rule 2.123(k); Fed. R. Civ. P. 30(d)(3)(A).  Having failed to do so, the objections are waived.

## III. Facts

We have examined the record and determined the following basic facts:

As noted, opposers are Russian manufacturers and distributors of non-alcoholic beverages.  The goods were sold in Russia with labels bearing Russian wording in stylized Cyrillic script and design elements virtually identical to the script which appears in the subject applications, as well as opposers' pending applications. The common Russian wording is ДЮШЕС,[34] ТАРХУН,[35] and ЭКСТРА-

---

his recollection, subject to certain rights of the adverse party, which were not invoked. *See* Fed. R. Evid. 612.

[34] *See* applicant's '896 Application and opposers' '895 Application.

[35] *See* applicant's '780 Application and opposers' '669 Application.

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

СИТРО.[36]  The marks as applied-for and as currently used by
both parties include transliterations or translations of the
Russian wording.  Those are DUCHESSE, ESTRAGON, and EXTRA-
CIDER, respectively.[37]

Evgeny Zuev, Deputy General Director of Zao Gruppa
Predpriyatij Ost, produced business reports and testified
that beginning at least as early as 2001, opposers exported
beverages bearing the marks to the United States.[38]  For
instance, Exhibit 6, summarizing opposers' export shipments
to the U.S. (by product) indicates regular shipments of
DUCHESSE, ESTRAGON, and EXTRA-CIDER beverages to B & B from
2001-2004,[39] and to applicant in 2004-2005.  Zuev Test. 25-
33.  Similarly, Edward Tkach, President of B & B
International Connections, Inc., testified that he began
importing opposers' branded products in 2001.[40]  This

---

[36] *See* applicant's '812 Application and opposers' '835
Application.

[37] For ease of reference, we refer to the marks by their
translation or transliteration.

[38] Although the reports cover years up to 2005 or 2006, Mr. Zuev
testified that opposers' sales of the goods to the U.S. have
continued to the date of testimony.  Zuev Test. at 22.

[39] This exhibit also notes a single shipment to B & B in November
2000.  Although his testimony is somewhat garbled, Mr. Zuev
acknowledged that there were some early sales which may have been
sporadic or of smaller volume.  Zuev Test. at 25 ("Of course the
sales happened.  Sales happened.  Took place.  It wasn't much.").
This is consistent with opposers' interrogatory responses
discussed above.

[40] Mr. Tkach noted that it was possible that there were some sales
prior to 2001, arranged through his brother.  Tkach Test. at 11.

35

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

evidence was submitted under seal, so we will not discuss it
in detail, but they appear to be commercially meaningful,
and they were not token quantities or sham transactions
engaged in merely to secure putative trademark rights.  *See,
e.g.*, Zuev exh. 5 and accompanying testimony.

From 2001 until 2004, opposers' products were imported
into the United States by B & B, a company which imports
grocery products from Eastern Europe and Russia into the
United States for wholesale distribution.  Tkach Test. at 4.
On March 18, 2004, the parties signed a contract ("first
contract") which was modified and superseded by another
agreement signed September 18, 2004 ("second contract").
Applicant was aware of opposers' ongoing production of the
goods in Russia.  Hrach Voskanyan, President of applicant
Vosk International Co., testified that he chose to go into
business with opposers' because "[t]hey had good production
… I mean the sales volume in Russia."  Voskanyan Test. at
14-15.  Applicant communicated with opposers regarding
several suggested changes to opposers' labels, and as a
result, the English translation or transliteration was added
to each label, Voskanyan Test. at 17, as were several other
items, such as the nutrition facts, and the California

36

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

bottle redemption value.[41]  Voskanyan Test. at 19.

Nonetheless, By the Spring of 2005, the relationship between the parties had deteriorated, and opposers began the process of terminating the second contract.

On March 15, 2005, opposer Zao Gruppa Predpriyatij Ost filed the following trademark applications, which have been conditionally refused registration in view of applicant's prior-filed applications:

| App. No. | Mark | Goods | Translation | Disclaimer |
|----------|------|-------|-------------|------------|
| 78587895 |  | Non-alcoholic drinks, namely, soft drinks.<br><br>First Use: 11/11/2000<br>In Commerce: 11/11/2000 | The non-Latin characters in the mark transliterate to "DUCHESSE" and this means "duchesse pear" in English. | |
| 78587669 |  | Non-alcoholic drinks, namely, soft drinks.<br><br>First Use: 11/11/2000<br>In Commerce: 11/11/2000 | The non-Latin characters in the mark transliterate to tarhoon and this means estragon in English. | ESTRAGON |

---

[41] There is some dispute about which party approved these changes to the labels.  Applicant contends that "the contents of the label were under [applicant's] control at all times," App. Br. at 7-8, suggesting its exercise of authority over use of the marks with opposers' consent.  Nonetheless, the changes to the label were either insignificant or required U.S. law.  *See infra* n. **Error! Bookmark not defined.**, 48.  Indeed, these are the types of labeling changes one might expect an importer or distributor to recommend to its foreign manufacturer based on its better understanding of the law and custom of the domestic market.

Exhibit B - Page 57

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

| App. No. | Mark | Goods | Translation | Disclaimer |
|---|---|---|---|---|
| 78587835 |  | Non-alcoholic drinks, namely fruit-flavored soft drinks.<br><br>First Use: 11/11/2000<br>In Commerce: 11/11/2000 | The non-Latin characters transliterate to "Extra-Citro". The closest translation to English language wording is "Extra-Cider". | |

App. NOR (July 30, 2009).

In early 2006, opposers commenced these proceedings, opposing registration of the subject applications.

**IV.  Discussion**

**A.   Standing**

To establish their standing to oppose registration of applicant's marks, opposers must prove that they have a real interest in the outcome of this proceeding and thus a reasonable basis for their belief that they would be damaged by issuance of a federal trademark registration of the mark to applicant.  *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982); *Time Warner Entm't Co. v. Jones*, 65 USPQ2d 1650 (TTAB 2002).

Both opposers have clearly established their standing: First, Zao Gruppa Predpriyatij OST has filed trademark applications which have been conditionally refused

Exhibit B - Page 58

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

registration in view of the subject applications.[42]  *Life Zone Inc. v. Middleman Group Inc.*, 87 USPQ2d 1953, 1959 (TTAB 2008) (standing found because the opposed application was cited as a potential bar to opposer's registration); *see Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).  Applicant admitted opposer's allegations regarding the filing of these applications in its answers and submitted notices of reliance on the applications, along with Office actions citing applicant's marks as a potential bar to registration.  Answer ¶ 7 ('423 Opp.), ¶ 4 ('446 and '098 Opps.); App. NOR (July 30, 2009).

Second, opposer Zao Ost Aqua has shown use of the marks in the context of a plausible claim of priority and likelihood of confusion.  *Giersch v. Scripps Networks Inc.*, 90 USPQ2d 1020, 1022 (TTAB 2009) (common-law use sufficient to establish standing).  The testimony and evidence show that Zao Ost Aqua exported goods to the United States under contracts with both B & B (prior to any use claimed by applicant) and with applicant.[43]

---

[42] To be clear, opposers' applications are not before us. Although they may help establish opposers' standing, whether opposers are entitled to the registrations they seek is irrelevant to the question of whether applicant is entitled to registration of the marks in the subject applications.

[43] Opposers further contend that they have standing because "they are the manufacturer of the goods sold by [a]pplicant and have prior use of the Cyrillic marks in Russia."  Opp. Br. at 9.  In light of the other evidence of standing, it is unnecessary to

39

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

### B.   Priority

Because opposers do not own a U.S. registration, in order to prevail on a claim under Trademark Act § 2(d), they bear the burden of demonstrating a proprietary interest acquired through use of their marks prior to either the filing date of applicant's intent-to-use applications or applicant's proven date of first use, whichever is earlier. *Herbko Int'l Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002); *Otto Roth & Co., Inc. v. Universal Corp.*, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981); *Miller Brewing Co. v. Anheuser-Busch Inc.*, 27 USPQ2d 1711, 1714 (TTAB 1993).

While opposers must show as an initial matter that they have rights in a "mark ... previously used in the United States ... and not abandoned,"  Trademark Act § 2(d), opposers' prior use need not have been proper trademark usage such as would support their own application for registration.  *See e.g., First Niagara Ins. Brokers Inc. v. First Niagara Fin. Group Inc.*, 476 F.3d 867, 81 USPQ2d 1375, 1378 (Fed. Cir. 2007) (foreign opposer need not prove use "in commerce lawfully regulated by Congress"); *Fair Indigo LLC v. Style Conscience*, 85 USPQ2d 1536, 1539 (TTAB 2007)

---

reach the question of whether either contention would be sufficient.

40

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

(opposer may rely on activity analogous to trademark use).

### 1.   Distinctiveness under *Otto Roth*

As an initial matter, applicant complains that it is opposers' burden to "prove that [DUCHESSE and ESTRAGON] are not descriptive or generic, or that they have acquired distinctiveness," and that they have not met that burden. App. Br. at 11 (citing dictionary definitions)[44] (footnotes omitted). We disagree.

In *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40 (CCPA 1981), the Court of Customs and Patent Appeals held that in order to prevail under Trademark Act § 2(d), a plaintiff must possess some proprietary right in an asserted common-law mark which is "distinctive," in the sense that it is used as an indicator of source and has at least some inherent or acquired ability to fulfill that function.[45] *Id.* at 44; *Towers v. Advent Software Inc.*, 913 F.2d 942, 16 USPQ2d 1039, 1041 (Fed. Cir. 1990). But this is not a particularly high burden, and the question is not

---

[44] The dictionary definitions indicate that "estragon" is another word for the herb "tarragon," and that "duchesse" is a variety of pear. App. NOR (July 30, 2009). There appears to be no dispute that the beverage sold by both parties under the DUCHESSE mark is pear-flavored, and that the ESTRAGON drink is flavored with tarragon.

[45] If, on the other hand, the plaintiff proves ownership of a mark registered on the Principal Register, its validity (and therefore its distinctiveness) is presumed, Trademark Act § 7(b), and that presumption is conclusive in the absence of a counterclaim for cancellation, Trademark Rule 2.106(b)(2)(ii).

Exhibit B - Page 61

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

whether one element of the asserted mark is descriptive, but whether the plaintiff's asserted mark is as a whole distinctive, that is, whether it is a "mark" at all.

Our cases generally accept, without an affirmative showing of distinctiveness by the plaintiff, that a plaintiff's common-law marks are distinctive if they appear inherently distinctive on their face, at least in the absence of evidence to the contrary. *See, e.g., Giersch*, 90 USPQ2d at 1023 (TTAB 2009) ("Respondent has not raised an issue as to the distinctiveness of petitioner's mark or otherwise put petitioner on notice of this defense, and therefore we find that the mark is distinctive." (citing *Wet Seal Inc v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1634 (TTAB 2007) (absent argument or evidence from applicant, opposer's mark deemed distinctive)); *Chicago Corp. v. N. Am. Chicago Corp.* 20 USPQ2d 1715, 1717 n.5 (TTAB 1991)(rejecting applicant's argument that opposer failed to prove that its mark was distinctive where applicant failed to plead the issue or introduce evidence of non-distinctiveness).

We find that opposers' asserted marks are clearly and inherently distinctive, and that applicant's proffered definitions of the words "duchesse" and "estragon" do not in any way suggest that opposers' marks incorporating those words are, as a whole, non-distinctive.  Even if it is

42

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

accepted that "duchesse" and "estragon" are descriptive of the parties' beverages,[46] opposers' marks include distinctive design elements and stylization.  Similar to questions arising under Trademark Act § 2(e)(1); 15 U.S.C. § 1052(e)(1), the threshold issue of whether a plaintiff's mark is distinctive under *Otto Roth* must clearly be based on the distinctiveness of the asserted mark as a whole, not merely on parts of it.  In the absence of any evidence to the contrary, we thus find that opposer's marks are inherently distinctive.[47]

### 2.   Priority of Use

Having established that opposers' marks are distinctive, the next question is whether those marks were

---

[46] Applicant notes that it has disclaimed the terms DUCHESSE and ESTRAGON in its respective applications, and that opposers have disclaimed ESTRAGON in their application.  Nonetheless, the disclaimer of part of a mark is not evidence that the mark is descriptive as a whole; if anything, it implies that the mark as a whole might be registrable *notwithstanding* the descriptiveness of the disclaimed term.  That is the purpose of the disclaimer. *See* Trademark Act § 6; 15 U.S.C. § 1056 ("The Director may require the applicant to disclaim an unregistrable component of a mark otherwise registrable.")

[47] We further note that opposers' marks are essentially identical in their dominant part to applicant's marks, and they are used on identical goods.  *See infra*.  We cannot accept applicant's apparent claim that its mark is a distinctive indicator of source for its goods, capable of registration on the Principal Register, while opposer's use of the same designation on the same goods cannot be considered a mark at all.  Applicant's own applications for registration of the DUCHESSE and ESTRAGON trademarks are assertions that its own marks are, as a whole, distinctive.  And if applicant's marks are distinctive, the same marks used on the same goods by opposers must likewise be distinctive.

43

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

"previously used in the United States," Trademark Act
§ 2(d), *i.e.*, whether opposers' first use of the marks was
prior to any date upon which applicant can rely.

### a.   Applicant's Priority Date

The subject applications were each filed based on
Trademark Act § 1(b); 15 U.S.C. § 1051(b), alleging a *bona
fide* intent to use the marks in commerce.  Based on the
filing dates of its applications, applicant can claim
constructive use dates for priority of September 2, 2004
(ESTRAGON and EXTRA-CIDER applications), and September 19,
2004 (DUCHESSE application).

Applicant also claims priority based on its actual use
of the marks.  The parties disagree over whether applicant's
activities under the parties' contracts inured to the
benefit of applicant or opposers, but there is no evidence
of applicant's use of the marks prior to the parties'
agreements.  It is unnecessary to decide this question
because, even if applicant may rely on its use while under
contract with opposers, the very earliest date on which
applicant could rely for priority is subsequent to March 18,
2004, the date of the first contract between the parties.

### b.   Opposers' Priority Date

As recounted above, Evgeny Zuev, and Edward Tkach,
President of B & B, provided testimony and other evidence

44

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

that opposers began importing beverages into the United
States under the relevant marks at least as early as 2001.
B & B imported the goods into the United States and sold
them here in significant quantities well-prior to March
2004, when the parties signed their first contract.
Therefore, opposers have clearly established their priority
of use of the marks in connection with the involved goods.

   C.   **Likelihood of Confusion**

   Our determination under Trademark Act § 2(d) is based
on an analysis of the probative facts in evidence that are
relevant to the factors bearing on the likelihood of
confusion issue. *In re E.I. du Pont de Nemours & Co.*, 476
F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); *Palm Bay Imp.,
Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396
F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic
Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed.
Cir. 2003); *In re Dixie Rests. Inc.*, 105 F.3d 1405, 41
USPQ2d 1531 (Fed. Cir. 1997).  In considering the evidence
of record on these factors, we keep in mind that "[t]he
fundamental inquiry mandated by Section 2(d) goes to the
cumulative effect of differences in the essential
characteristics of the goods and differences in the marks."
*Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d
1098, 192 USPQ 24, 29 (CCPA 1976); *see In re Azteca Rest.*

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

*Enters., Inc.*, 50 USPQ2d 1209 (TTAB 1999).

There appears to be little serious dispute as to likelihood of confusion in this case; in fact, the parties barely mention the issue in their briefs.  Opposers characterize their marks as "substantially similar, if not virtually identical, to the opposed marks...," Opp. Br. at 9, and note that "[a]pplicant, by its answers, admitted that the marks it seeks to register are similar to the stylized Cyrillic marks of [o]pposers," Opp. Br. at 2.  For its part, applicant appears to sum up both its view and that of opposers in characterizing "[t]he main issue in this case" as whether opposers can establish "superior common law trademark rights," and if so, whether "[a]pplicant can prevail on its affirmative defenses."  App. Br. at 5.

Nonetheless, neither applicant nor opposers discuss any specific similarities or differences in the marks or the goods at issue, or any other relevant *du Pont* factor, nor does applicant clearly admit that there is a likelihood of confusion (as opposed to similarity of the marks). Accordingly, we must consider whether opposers have met their burden of demonstrating a likelihood of confusion.

1.   **The Similarity or Dissimilarity of the Marks
      in their Entireties**

In a likelihood of confusion analysis, we compare the

46

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

marks for similarities and dissimilarities in appearance, sound, connotation and commercial impression. *Palm Bay*, 73 USPQ2d at 1692. "[T]he test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result." *H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d 1715, 1727 (TTAB 2008).

While we must consider the marks in their entireties, it is entirely appropriate to accord greater importance to the more distinctive elements in the marks. "[I]n articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable." *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

Finally, we keep in mind that "[w]hen marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines." *See Century 21 Real Estate Corp. v.*

47

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

*Century Life of Am.*, 970 F.2d 874, 23 USPQ2d 1698, 1700, 1701 (Fed. Cir. 1992).

Applicant's three marks in the subject applications each comprise stylized Cyrillic lettering, Roman-lettered translations or transliterations of the Cyrillic lettering and, in the case of applicant's '780 and '812 applications, minor design elements.  As can be seen from even a cursory examination, each of applicant's marks is essentially identical to the dominant portion of opposers' respective marks:



| Applicant's Marks | Opposer's "Cyrillic" labels |
|---|---|

48

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

| Applicant's Marks | Opposer's "Cyrillic" labels |
|---|---|
|  | |

The stylized Cyrillic and English marks in the subject applications are virtually identical to part of the marks opposers have used and are using on their goods in the United States, both before and after the addition of the Roman-lettered translation or transliterations which appear in both the subject applications and opposers' later usages and applications.

While the identical small Roman lettering is part of the marks currently claimed by both parties, opposer's earliest use of its marks in the United States did not include the Roman lettering, which was added upon applicant's suggestion.  However, we do not consider the addition of this element to constitute a significant change in the marks.  As noted in both the subject applications and in opposers' corresponding applications, the Roman lettering is simply a translation or transliteration of the mark, *see also*, Tkach Test. at 6-8, and as such does not significantly

49

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

change the meaning of the mark, and its size provides only a very minimal visual impression.  As such, we consider opposers' currently used marks to be essentially the same mark as their earlier-used Cyrillic label, creating "the same, continuing commercial impression."  *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes Inc.*, 971 F.2d 732, 23 USPQ2d 1701, 1704 (Fed. Cir. 1992) (quoting *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 17 USPQ2d 1866, 1868 (Fed. Cir. 1991)).  Thus, even though applicant's earliest use did not include the Roman lettering, it is entitled to rely on that use for priority under the "tacking" doctrine.

An obvious difference between the marks as depicted above is that while applicant seeks registration of the stylized Cyrillic and Roman lettering, opposers have demonstrated their use of (and seek registration for) the same stylized literal elements, used as a part of its label design as a whole.[48]  Opposers' marks include the label

---

[48] Opposers have proffered labels as they were first used on the goods in U.S. commerce.  Tkach Test. 9, 11-12, 14, exh. 6-10, 12. Opposers do not explicitly state whether they claim common-law rights in the stylized wording alone (as applicant does), or whether they claim common-law rights to their overall label design, including the stylized wording (as is the case in their pending applications).  We assume (without deciding) that opposers' are asserting common-law rights in the stylized literal elements used as a part of their overall label design.  But because we find the marks highly similar nonetheless, our ultimate conclusion on the question of likelihood of confusion would be no different even if our assumption is incorrect.  (That is, if we considered only the stylized literal elements of

50

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446


shape and color, and, in the case of the EXTRA-CIDER and
DUCHESSE marks, the depiction of fruit (citrus fruit and
pears, respectively).

Nonetheless, background shapes, or "carriers," such as
the shape of opposers' labels, typically do not make a
strong commercial impression. *In re Kysela Pere et Fils
Ltd.*, 98 USPQ2d 1261, 1267 (TTAB 2011) (citing *In re Dixie
Rests. Inc.*, 41 USPQ2d at 1534)); *B.V.D. Licensing Corp. v.
Rodriguez*, 83 USPQ2d 1500 (TTAB 2007) (citing *In re
Anton/Bauer Inc.*, 7 USPQ2d 1380, 1381 (TTAB 1988)).
Likewise, the depictions of fruit on the DUCHESSE and EXTRA-
CIDER labels are not strong indicators of source, as they
are at best suggestive of the flavoring of the beverages.
Finally, as we have often noted, when a mark comprises both
literal and figurative elements, the words are generally
considered dominant since they will be used to call for, or
refer to the goods. *CBS Inc. v. Morrow*, 708 F.2d 1579,

---

opposers' labels, we would find them to be essentially identical
to applicant's applied-for marks.)

 Note, however, that we do <u>not</u> consider various other items
appearing on opposers' labels to constitute parts of its
trademark. Labels as actually used in commerce usually include
all sorts of informational and non-distinctive material
(including "Handle With Care - Do Not Shake," "Nonalcohol
Sparkling Beverage," "nutrition facts," ingredients, the
universal product code, and bottle redemption values). *See,
e.g.*, Voskanyan Test. exh. 5-6. Some of these are required by
law, others are not. But none would be viewed by any reasonable
consumer as an indicator of source, *i.e.*, as a trademark or part

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

1581-82 (Fed. Cir. 1983); *In re Dakin's Miniatures Inc.*, 59 UPSQ2d 1593, 1596 (TTAB 2001); *In re Appetito Provisions Co., Inc.*, 3 USPQ2d 1553, 1554 (TTAB 1987). Thus, while we consider opposers' marks in their entireties, without ignoring any parts of them, we conclude that the stylized literal elements clearly dominate the overall impression of them, and that the other elements do not significantly detract from or alter that impression.

Finally, in comparing opposer's mark with applicant's, we conclude that applicant's marks are virtually identical to the dominant portion of each of opposers' respective marks. We therefore find the marks as a whole to be highly similar, a factor which strongly supports a finding of a likelihood of confusion.

### 2. The Similarity or Dissimilarity and Nature of the Goods, Purchasers, Channels of Trade

The goods at issue are traditional Russian soft drinks with specific flavors. *E.g.*, Voskanyan Test. at 15-16 (DUCHESSE). They are identified in the subject applications as "non-alcoholic drinks, namely soft drinks," (DUCHESSE and ESTRAGON applications) and "non-alcoholic drinks, namely fruit-flavored soft drinks," (EXTRA-CIDER application). Because none of the applications are limited as to their

---

of one. *Cf.* TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 1202.04

52

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

channels of trade or purchasers, "it is presumed that the scope of the registration encompasses all goods of the nature and type described, that the identified goods move in all channels of trade that would be normal for such goods, and that the goods would be purchased by all potential customers." *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981), (citing *Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958)).  It is undisputed that opposers' use their respective marks on the same type of soft drinks, and that in any event, applicant's identification of goods is broad enough to encompass opposers' goods.

Further, because there are no specific limitations in the subject applications, applicant's goods must be construed to be intended for sale in all normal channels of trade and to all usual consumers of such goods.  Thus, applicant's channels of trade and intended consumers are deemed to include (at least) the same channels of trade and classes of consumers for which opposers have established sales.

These factors further support a finding of likelihood of confusion.

### 3.   Balancing the Factors

Given the highly similar marks, legally identical

---

(7th ed. 2010) (informational material not generally registrable).

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

goods, identical customers, and channels of trade at issue, we conclude that use of the subject marks on the identified goods would clearly give rise to a likelihood of confusion in view of opposer's allegedly prior use of its marks.

### D.   Applicant's Defenses and Other Arguments

In response to opposer's evidence, applicant unleashes a scattershot volley of arguments and objections regarding both its affirmative defense and various attacks on the credibility of opposers' witnesses and evidence.  We start with applicant's defense.

### 1.   Unclean Hands

Applicant has gone to great lengths in arguing that opposers' prior use of the marks was illegal and did not result in the creation of trademark rights, or that opposers may not rely on any such rights because of their "unclean hands."  *See* App. Br. at 26-28.  Applicant relies on various evidence, including FOIA requests to the FDA, and Mr. Voskanyan's testimony.  In response, opposers presented the testimony of Patrick Gill, an attorney, as an expert in the law relating to the importation of goods into the United States, and recalled Mr. Tkach during their rebuttal period.

Applicant alleges that opposers violated various rules and statutes in its importation of products into the United States, including rules regarding the labeling and packaging

Exhibit B - Page 74

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

of imported food and – more seriously – that applicant imported its ESTRAGON beverage into the United States notwithstanding that it contained an ingredient not permitted for food use in the United States.

As a general rule, in order to establish trademark rights, one's use of a mark must be legal use in commerce. This principle would clearly apply, for instance, if the goods or services were themselves illegal – such as an application to register a mark for use on drugs that may not be legally sold.

Opposers' soft drinks – like applicant's goods – are not themselves illegal, nor is it alleged that they are or can be used for an illegal purpose. Rather, applicant alleges that opposers violated various statutes and rules in the importation or sale of its goods because of the manner of their importation or their ingredients.

The lawful use doctrine is based on the USPTO's own interpretation of the requirement that a mark be used in commerce, *Western Worldwide Enters. Group Inc. v. Qinqdao Brewery*, 17 USPQ2d 1137 (TTAB 1990), although its limits remain unclear. The Board has long recognized many of the difficult problems raised by its application. Some time ago, we noted that we have heard

cases involving the lawfulness of use under such

55

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

> statutes as the Federal Food, Drug, and Cosmetic
> Act, the Federal Meat Inspection Act, the Federal
> Insecticide, Fungicide, and Rodenticide Act, and
> the Federal Clean Air Act.  Due to a proliferation
> of federal regulatory acts in recent years, there
> is now an almost endless number of such acts which
> the Board might in the future be compelled to
> interpret in order to determine whether a
> particular use in commerce is lawful.  Inasmuch as
> we have little or no familiarity with most of
> these acts, there is a serious question as to the
> advisability of our attempting to adjudicate
> whether a party's use in commerce is in compliance
> with the particular regulatory act or acts which
> may be applicable thereto.

*Satinine Societa in Nome Collettivo di S.A. e M. Usellini v.*

*P.A.B. Produits et Appareils de Beaute*, 209 USPQ 958, 964

(TTAB 1981) (declining to find opposer's use invalid under

the Trademark Act); *see also id*. at 967 (Kera, concurring)

(suggesting that "There must be some nexus between the use

of the mark and the alleged violation before it can be said

that the unlawfulness of the sale or shipment has resulted

in the invalidity of an application or registration.").  The

points raised in *Satinine* are at least as relevant today as

they were then.

In a pair of cases, *Kellogg Co. v. New Generation*

*Foods, Inc.*, 6 USPQ2d 2045 (TTAB 1988) (which we need not

discuss in detail), and *General Mills Inc. v. Health Valley*

*Foods*, 24 USPQ2d 1270 (TTAB 1992), the Board again

considered the illegal use doctrine, and again refused to

find that the alleged illegality vitiated the prior user's

56

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

trademark rights.  In both cases, illegal use was raised as a ground to cancel the prior user's pleaded registration by counterclaim, unsuccessfully in both cases.

In *General Mills*, applicant alleged – and the opposer admitted – that the initial shipment upon which its date of first use was based did not comply with FDA labeling regulations.  *General Mills*, 24 USPQ2d at 1273.  The Board summarized an approach to the issue consistent with *Satinine*:

> [T]he better practice in trying to determine whether use of a mark is lawful under one or more of the myriad regulatory acts is to hold a use in commerce unlawful only when the issue of compliance has previously been determined (with a finding of noncompliance) by a court or government agency having competent jurisdiction under the statute involved, or where there has been a *per se* violation of a statute regulating the sale of a party's goods.  *See Santinine Societa v. P.A.B. Produits*, 209 USPQ 958 (TTAB 1981); *Kellogg Co. v. New Generation Foods*, Inc., 6 USPQ2d 2045 (TTAB 1988).
>
> . . .
>
>     Where, as here, a party seeks to show that use by the adverse party was unlawful by virtue of noncompliance with a labeling statutory provision, it is incumbent upon the party charging that the use was unlawful to demonstrate by clear and convincing evidence more than that the use in question was not in compliance with applicable law.  Such party must prove also that the non-compliance was material, that is, was of such gravity and significance that the usage must be considered unlawful – so tainted that, as a matter of law, it could create no trademark rights – warranting cancellation of the registration of the

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

mark involved.

*General Mills*, 24 USPQ2d at 1273-74. (citations revised).

The Board noted that the applicant had presented no evidence of a final determination of noncompliance by any court or agency.  Indeed, notwithstanding General Mills' *admission* of a statutory violation, the Board found that the applicant had not met its burden of proof, because it had not demonstrated a "nexus between the use of the mark and the alleged violation [such that] the unlawfulness of a shipment can be said to result in the invalidity of a registration."  *General Mills*, 24 USPQ2d at 1274 (citing *Santinine*, 209 USPQ at 967 (Kera, concurring)).  The Board also expressed concern for the disproportionality of the penalty of cancellation as a result of a seemingly minor violation:  "Although opposer acknowledges its inadvertent failure to comply fully with these regulations, we agree with opposer that its technical noncompliance should not result in the Draconian result of cancellation of its registration."  *General Mills*, 24 USPQ2d at 1273.

The only Board precedent substantively addressing the illegal use doctrine in the two decades since *General Mills* is *Automedx Inc. v. Artivent Corp.*, 95 USPQ2d 1976 (TTAB 2010).  In that case, the applicant alleged that the opposer's prior sales of its medical ventilators were

58

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

illegal because opposer had neither approval from the FDA

(which is generally required prior to sale of a medical

device) nor had it applied for an exemption for which it

might have been eligible.  Continuing our narrow application

of the illegal use doctrine as applied in *Satinine*, *Kellogg*,

and *General Mills*, the Board again denied applicant's

counterclaim:

> [W]e find that applicant failed to show that there was
> a *per se* violation of any law or FDA regulations.  As
> previously indicated, we disagree with applicant's
> premise that the products sold by opposer to the
> military were required to be FDA approved before the
> sales of those products may constitute *bona fide* use of
> the mark in commerce.

*Automedx*, 95 USPQ2d at 1985.  In sum, while the illegal use

doctrine remains the law, it has been interpreted very

narrowly, and in practice, it has not been successfully

invoked in a reported (or, as near as we can tell,

unreported) Board case for at least thirty years.

In the case at bar, applicant points to allegedly

unlawful acts by opposers and B & B, including that upon

importation, Mr. Tkach cut into the products' packaging to

affix labels for the U.S. market.  Applicant maintains that

a "repackaging permit" was required in order to do so, a

conclusion which opposers dispute.  Similarly, applicant

also notes that opposers or B & B may have violated labeling

requirements in the importation of the goods.  *See* App. NOR

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

(Aug. 21, 2009).  Suffice it to say that applicant has not

met its burden to show a *per se* violation of law, *see*

*Automedx*, 95 USPQ2d at 1985, or that if it did, any use of

the mark "was so tainted that, as a matter of law, it could

create no trademark rights."  *General Mills*, 24 USPQ2d at

1274.  The facts as to these allegations remain unclear, as

is the requirement for a repackaging permit.  *E.g.*, Gill

Test. at 29-30.

    Applicant's other allegation of illegality is more

serious.  Applicant claims that in early 2005, the FDA

detained a shipment of opposers' ESTRAGON beverage, because

it allegedly contained "Patent Blue V," which is claimed to

be a colorant not approved for use in the U.S.  There is

some disagreement about exactly what ensued, but it appears

that applicant and opposers exchanged some communications

about the problem.[49]  Evidently neither opposers nor

applicant disputed the substance of the FDA's initial

finding, and the detained shipment was eventually destroyed.

    The evidence indicates that the colorant issue

---

[49] Much of the evidence on this point is hearsay, and cannot be
used to prove that, for instance, opposers' goods actually
contained the banned colorant.  However, in an e-mail from
opposers' employee to applicant on this matter, opposers
seemingly admit that they were able to confirm (after the fact)
that the Estragon extract they purchased from a third party
contained the colorant.  Voskanyan Test. at 45-46, exh. 13.

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

pertained to one shipment of opposers' ESTRAGON[50] product,
and that this occurred long after opposers first established
use in the United States.  There is no evidence that any
shipment before or after the one which was detained
contained any improper ingredients.[51]  Evidence proffered by
applicant indicates that opposers had purchased the
flavoring ingredient for ESTRAGON from another company, Wild
Rossiy, and were possibly not aware that it contained an
ingredient not permitted in the U.S.  Voskanyan Test. at 45-
46, exh. 13.

Again, we find that applicant has not met its burden to
show that the incident of illegality alleged here is of a
type that would entirely vitiate opposers' common-law rights
in its ESTRAGON mark, *see General Mills*, 24 USPQ2d at 1274,
which by 2005 were well-established.  Nor is there any
"nexus between the use of the mark and the alleged
violation...."  *Id.*  The alleged violation had nothing to do
with opposers' use of their asserted marks, and it occurred

---

[50] There is no allegation that opposers' DUCHESSE or EXTRA-CIDER
products contained any unlawful ingredient, or that their
importation or sale was ever questioned by any authority.

[51] Without citation to the record, applicant alleges in its brief
that there was a second incident – in 2008 – also relating to
Patent Blue V colorant in opposer's ESTRAGON product.  App. Br.
at 27.  Applicant's own evidence from the FDA contradicts this
allegation.  App. NOA (Aug. 28, 2009).  While the FDA data
suggest that opposer's ESTRAGON bottles were not properly
labeled, there is no allegation by the FDA that the beverage
contained banned ingredients.

Exhibit B - Page 81

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

long after they had established rights in the mark based on use.  Finally, it is not clear why abrogation of opposers' trademark rights would be appropriate six years after this incident, or that such action would in any way promote the aims of trademark law or otherwise benefit the public.[52] Applicant's affirmative defense is accordingly denied.

### 2.   Other Issues

Two more issues require brief mention.[53]

### a.   Contract Interpretation

As noted, the parties entered into two contracts during the course of their dealings.  Opposers claim they are distributorship agreements, Opp. Br. at 9-11, while applicant claims they are merely agreements for the purchase and sale of goods, App. Br. at 20-26.

---

[52] We do not intend to minimize the potential seriousness of the alleged violation here.  Nonetheless, the government agencies most intimately involved were apparently satisfied when the incident was resolved with destruction of the offending shipment, and have apparently taken no further action.

[53] Applicant makes various other attacks on the credibility of opposers' witnesses and evidence.  The record – including the evidence of both parties – is indeed confusing in places, due at least in part to language and translation issues, discovery problems, and the way the case was presented.  But our task in considering credibility is not to determine whether and how the case could have been better prosecuted, but rather to ask whether the evidence can be believed.  We have considered applicant's arguments, and have taken them into account in weighing opposers' evidence.  But we cannot agree with applicant's contentions that, for instance, "Tkach [and] Zuev[] would say anything to prevail in the opposition without regard to the truth," App. Br. at 17, that we "may disregard Tkach's testimony all together [sic],"

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

The law is clear on the question of ownership as between a foreign manufacturer and a domestic distributor or importer:

> [T]he question of ownership of a trademark as between the manufacturer of a product to which the mark is applied and the exclusive distributor of that product, or as between a foreign manufacturer and the exclusive United States importer and distributor, is a matter of agreement between them, and in the absence of any such agreement, there is the legal presumption that the manufacturer is the owner of the mark.  Without such expressed or implied acknowledgement or transfer by the foreign manufacturer of rights in the trademark to the exclusive U.S. distributor, such distributor does not acquire ownership of a mark of a foreign manufacturer any more than a wholesaler can acquire ownership of the mark of a manufacturer, merely through sale and distribution of goods bearing the manufacturer's trademark.

*Audioson Vertriebs-GmbH v. Kirksaeter Audiosonics, Inc*., 196 USPQ 453, 456-57 (TTAB 1977) (citations omitted).

Applicant's argument is apparently that if it is merely a purchaser of opposers' goods, rather than opposer's licensed "distributor," it escapes the presumption of ownership by the foreign manufacturer, and therefore may own and register the marks itself.  Applicant interprets our precedent too narrowly, and in any event, resort to the presumption is unnecessary for opposers in this case.

We need not untangle the web of the contracts here.  It is enough to note that neither of them deals in any

---

App. Br. at 16, or that opposers evidence was "fabricated," App.

Exhibit B - Page 83

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

significant or explicit way with rights to the involved
trademarks.  Indeed, applicant characterizes the contracts
as "govern[ing] only the terms of purchase..." of the goods.
App. Br. at 22.  Assuming that applicant is correct – that
it simply purchased goods bearing the marks from opposers
and imported them into the United States – then the
contracts were silent on the issue of trademark ownership.[54]
But that is of no help to applicant, because "in the absence
of any such agreement, there is the legal presumption that
the manufacturer is the owner of the mark." *Audioson*, 196
USPQ at 456.  Under the rule in *Audioson*, applicant's
purchase of the goods gives it no right to register the
marks, and the presumption of ownership remains with the
manufacturer.  Although *Audioson* speaks primarily of the
rights of manufacturers vis-à-vis those of "distributors,"

---

Br. at 12.

[54] Applicant weakly attempts to argue that the contract
transferred the marks from opposer to applicant because under one
provision, "the property right to the delivered goods transfers
to Applicant at the moment of production.  Therefore, when [the
contract] was formed, the property rights of the delivered goods,
including the intellectual property rights, transferred to
Applicant when it purchased the goods," App. Br. at 25-26, adding
that any ambiguity should be construed against opposers, who
drafted the contract.

  There is no ambiguity here; applicant is simply incorrect.  It
is clear that the "property rights" in question are rights to the
*goods*, not to any intellectual property rights that may be
associated with opposer's business of manufacturing and selling
them.  The right to use and register a trademark is not
transferred by a mere purchase of goods bearing the mark.

Exhibit B - Page 84

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

it is quite clear that the principle enunciated is not limited to manufacturer relationships with formal distributors – that would make no sense given the reasoning of the presumption, which is grounded in treaty and need to protect foreign manufacturers against the registration of their marks in other countries. *See Global Maschinen GmbH v. Global Banking Sys., Inc.*, 227 USPQ 862, 866-867 (TTAB 1985).

But in any event, opposers here need not rely on the presumption discussed in *Audioson*. As discussed above, they had already established common-law rights in their marks in the United States prior to applicant, and the contracts did not clearly transfer opposers' pre-existing rights to applicant. *See Global Maschinen*, 227 USPQ at 867 ("Not only was there no agreement to rebut the presumption of ownership in the foreign manufacturer, petitioner, but in this case petitioner had established ownership rights in the mark ... in the United States prior to the filing date of respondent's application for registration and the date of any sales by respondent.... Accordingly, registrant is not the owner of the trademark....").

b.   **Opposers' Prior Application**

Applicant points out that on March 12, 2001, opposers filed an application for registration of the standard-

65

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

character mark DUCHESSE under the "intent-to-use" provisions
of Trademark Act § 1(b), 15 U.S.C. § 1051(b).[55]  That
application was abandoned for failure to file a statement of
use on December 19, 2007.  Applicant argues that opposers'
actions with respect to the '242 Application were
inconsistent with its position in this case that it was
actually using the mark at the time, and urges that we
consider this as evidence that applicant was not in fact
using its marks in the U.S. at any time prior to the
abandonment of its '242 Application in late 2007.  App. Br.
at 19-20.

We disagree; the declaration in an application of an
intent to use is not inconsistent with actual use.  *Cf. Fair
Indigo LLC v. Style Conscience*, 85 USPQ2d 1536, 1539 (TTAB
2007) (ITU applicant may rely on its use prior to
application for purposes of priority (citing *Corporate
Document Svcs. Inc. v. I.C.E.D. Mgmt. Inc.*, 48 USPQ2d 1477,
1479 (TTAB 1998))).  The filing of an intent-to-use
application is in no way an admission of non-use.

Moreover, the fact that opposers' '242 Application was
abandoned at the statement of use stage is not – without
more – evidence that the DUCHESSE mark asserted by opposers

---

[55] Application No. 76223242 for the mark DUCHESSE for "Non-
alcoholic drinks namely, soft drinks, fruit-flavored drinks."

Opposition No. 91168423
Opposition No. 91169098
Opposition No. 91169446

in this proceeding was not in use.  Opposers' earlier

application may have become "abandoned" for reasons that

have nothing to do with whether the mark was in use, and

applicant offers no evidence of the circumstances resulting

in opposers' failure to complete the registration of that

mark.  Opposers may have intentionally decided not to file a

statement of use in the '242 application for a variety of

reasons, or the demise of that application may have been due

to mistake, oversight, or neglect.  Applicant's argument in

this regard is nothing more than an invitation to speculate.

V.    **Conclusion**

        We have carefully considered all of the parties'

evidence and argument, including that which we have not

specifically discussed.  We conclude that registration of

applicant's subject DUCHESSE, ESTRAGON, and EXTRA-CIDER

marks for the identified goods is likely to cause confusion

with opposer's previously-used marks pursuant to Trademark

Act § 2(d).  We have considered applicant's affirmative

defense and other arguments, but do not find them to merit a

different result.  To the extent there is any doubt, we have

resolved it – as we must – in favor of opposers, the prior

users.  *See Hard Rock Cafe Int'l (USA) Inc. v. Elsea*, 56

USPQ2d 1504, 1514 (TTAB 2000); *W.R. Grace & Co. v. Herbert

J. Meyer Indus., Inc.*, 190 USPQ 308, 311 (TTAB 1976) ("one

67

**Opposition No. 91168423**
**Opposition No. 91169098**
**Opposition No. 91169446**

who adopts a mark similar to the mark of another for the same or closely related goods or services does so at his own peril, and any doubt as to likelihood of confusion must be resolved against the newcomer").

**Decision:**  In each opposition, the opposition is SUSTAINED, and registration to applicant is refused.