Unpublished Cases Cited

Arista Records LLC v. Media Services LLC, Not Reported in F.Supp.2d (2008)
Case 2:11-cv-01488-RSL Document 8-1 Filed 10/10/11 Page 2 of 27
69 Fed.R.Serv.3d 1623

2008 WL 563470
United States District Court,
S.D. New York.

ARISTA RECORDS LLC, et al., Plaintiffs,

v.

MEDIA SERVICES LLC, Defendant.

No. 06 Civ. 15319(NRB).   Feb. 25, 2008.

Opinion

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

*\*1* Plaintiff record companies Arista Records, LLC, Atlantic Recording Corporation, BMG Music, Capitol Records, Inc., Elektra Entertainment Group Inc., Interscope Records, Motown Record Company, LP, Sony BMG Music Entertainment, UMG Recordings, Inc., Virgin Records America, Inc., and Warner Bros. Records Inc. (collectively "plaintiffs") asserted federal and common law copyright infringement and unfair competition claims against MediaServices, LLC ("MediaServices" or "defendant"), a Russian limited liability company that owns and operates two websites, www.allofmp3.com and www.allTunes.com. The amended complaint alleges that these websites facilitate the unlicensed reproduction and distribution of digital music in which plaintiffs have federal and common law copyrights. A "nonexhaustive" and "illustrative" list of fifty-one such copyrights is attached to the amended complaint as Exhibits A and B.

MediaServices has no known corporate presence in the United States. Thus, plaintiffs were faced with the prospect of serving MediaServices in the Russian Federation, which, in spite of being a signatory to the Hague Service Convention,[1] has temporarily suspended all judicial cooperation with the United States. Plaintiffs concluded that Hague service would be futile and resorted instead to serving process in accordance with Russian law governing domestic service.

Shortly thereafter, counsel for MediaServices appeared in this action for the limited purpose of filing motions to dismiss the amended complaint for insufficiency of service of process and failure to state a claim upon which relief can be granted. In their opposition brief, plaintiffs moved for an order authorizing substituted service upon MediaServices's

New York counsel pursuant to Fed.R.Civ.P. 4(f)(3). For the reasons stated herein, plaintiffs' motion is granted and MediaServices's motions are denied.

**DISCUSSION**

**I. Insufficiency of Service**

MediaServices argues that a district court may not exercise its discretion to authorize alternate service methods pursuant to Fed.R.Civ.P. 4(f)(3) unless a plaintiff has first attempted service through the Hague Service Convention. Under the particular circumstances of this case, we find that exhaustion under Rule 4(f) (3) is not required and further authorize substituted service upon MediaServices's New York counsel.[2]

Federal Rule of Civil Procedure 4(f) requires a plaintiff to serve foreign defendants in accordance with "any internationally agreed means reasonably calculated to give notice," such as the Hague Service Convention. Fed.R.Civ.P. 4(f)(1). Notwithstanding this provision, district courts have discretionary authority to direct service "by other means not prohibited by international agreements." Fed.R.Civ.P. 4(f) (3); *Brockmeyer v. May,* 383 F.3d 798, 805 (9th Cir.2004) ("The decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the discretion of the district court." (citation omitted)).[3] Court-directed service is particularly appropriate where a signatory to the Hague Service Convention has "refused to cooperate for substantive reasons." Fed.R.Civ.P. 4(f)(1), Advisory Committee's Notes to the 1993 Amendment; *id.* ("Use of the Convention procedures, *when available,* is mandatory if documents must be transmitted abroad to effect service." (emphasis added)); *see also RSM Production Corp. v. Fridman,* No. 06 Civ. 11512, 2007 WL 2295907, at *3 (S.D.N.Y. Aug. 10, 2007); *Salomon Bros. Inc. v. Huitong Int'l Trust & Inv. Corp.,* No. 94 Civ. 8559, 1997 U.S. Dist. LEXIS 8325, at *4-7 (June 10, 1997).[4] However, a plaintiff seeking relief under Rule 4(f)(3) must adequately support the request with affirmative evidence of the lack of judicial assistance by the host nation-conclusory assertions of the futility of Hague service are unavailing. *See Gateway Overseas, Inc. v. Nishat (Chunian) Ltd.,* No. 05 CV 4260, 2006 WL 2015188, at *4 (S.D.N.Y. July 13, 2006).

*\*2* Here, the record is plain that the Central Authority of the Russian Federation denies all requests for service of process originating from the United States. While the

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

Russian Federation and the United States are parties to the Hague Service Convention, judicial cooperation between the two countries has been suspended since July, 2003. *See* Bureau of Consular Affairs, U.S. Department of State, Russia Judicial Assistance, available at http:// travel.state.gov/law/ info/judicial/judicial_3831.html (last visited February 22, 2008). Consequently, "requests sent directly by litigants to the Russian Central Authority under the Hague Service Convention are returned unexecuted." *Id.; see also RSM Production Corp. v. Fridman,* No. 06 Civ. 11512, 2007 WL 1515068, at *1 (S.D.N.Y. May 24, 2007) (authorizing service on Russian defendant's attorney in the United States).[5] Because there is no reason to believe that service would be effective if plaintiffs were required to serve MediaServices in accordance with the Hague Service Convention procedures,[6] substituted service pursuant to Rule 4(f)(3) is appropriate.[7]

In crafting an alternate method of service, we recognize that MediaServices has actual notice of this action and, thus, as a practical matter, the purpose of the service requirement has already been accomplished.[8] *See Henderson v. United States,* 517 U.S. 654, 672 (1996). Nonetheless we recognize that there is persuasive authority for requiring service anew, even if a defendant has notice of the pendency of the action. *See Fridman,* 2007 WL 2295907, at *4; *Salomon Bros. Inc.,* 1997 U.S. Dist. LEXIS 8325, at *4-7. Accordingly, we direct that service be effected by hand delivering the summons, amended complaint, and other case initiation documents to MediaServices's attorneys at the New York office of Chadbourne & Parke, LLP, to the attention of John Kheit, Esq., and at the New York office of Zukerman Gore & Brandeis, LLP, to the attention of both John K. Crossman, Esq. and Jeffrey L. Friesen, Esq., by no later than March 3, 2008.

## II. Failure To State A Claim Under Fed.R.Civ.P. 12(b) (6)

MediaServices also contends that the amended complaint, which includes only a "non-exhaustive" and "illustrative" list of the allegedly infringed works, is dismissible for failing to specify each copyright that forms the basis for the instant action. We disagree.

It is well-settled that a copyright infringement claim must plead, *inter alia,* the original work that is the subject of the claim. *See Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D.N.Y.1992), *aff'd* 23 F.3d 398 (2d Cir.1994); *Plunket v. Doyle,* No. 99 Civ. 110066, 2001 WL 175252, at *4 (S.D.N.Y. Feb. 22, 2001); *Gee v. CBS, Inc.,* 471 F.Supp. 600, 643-44 (E.D.Pa.1979), *aff'd* 612 F.2d 572 (3d Cir.1979); *Burns v. Rockwood Distributing Co.,* 481 F.Supp. 841, 845 n. 3 (D.C.Ill.1979).[9] However, this rule of pleading a copyright infringement *claim* does not compel the dismissal of a *complaint* that identifies a subset of the infringed works and thus, properly states copyright claims predicated on the identified works. *See, e.g., Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 167 F.Supp.2d 1114, 1120 (C. D.Cal.2001).[10]

*\*3* Here, the amended complaint lists fifty-one copyrights that were allegedly infringed by MediaServices. Since MediaServices has not challenged the sufficiency of the allegations relating to these works, it is beyond dispute that the amended complaint states claims for federal and common law copyright infringement and unfair competition. Notwithstanding this conclusion, we acknowledge that the allegations of infringement are not limited to the specified works. While this fact does not warrant dismissal of an otherwise well-pleaded complaint, we recognize that plaintiffs must specify the copyrights for which they seek relief in order to obtain a monetary judgment against MediaServices for any established infringement.

## CONCLUSION

For these reasons, MediaServices's motions to dismiss the amended complaint are DENIED and plaintiffs' motion for substituted service is GRANTED. MediaServices shall file and serve an answer within twenty days of being served with the amended complaint. The parties are directed to appear for a conference before the Court on March 24, 2008 at 4:00 p.m. in Courtroom 21A.

**SO ORDERED.**

**Parallel Citations**

69 Fed.R.Serv.3d 1623

Footnotes

1    The Hague Service Convention is a multilateral treaty intended "to create appropriate means" for service abroad and "to improve the organization of mutual judicial assistance for that purpose by simplifying and expediting the procedure." Convention on the Service Abroad of Judicial and Extrajudicial Documents In Civil Or Commercial Matters ("Hague Service Convention"), Nov. 15, 1965, 20

U.S.T. 361, T.I.A.S. No. 6638, Preamble; *see also Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 698-700 (1988). Each member state is required to establish a Central Authority for receiving and processing requests for service upon defendants residing within the state. *See Schlunk,* 486 U.S. at 699. Service through the member state's Central Authority is not the exclusive method of service under the Hague Service Convention. *See Burda Media, Inc. v. Viertel,* 417 F.3d 292, 299-300 (2d Cir.2005). Article 10, for example, states in pertinent part:

> Provided the State of destination does not object, the present Convention shall not interfere with-

> (a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

> (b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

> (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

> 20 U.S.T. 362, T.I.A.S. 6638, Art. 10.

2  Accordingly, we need not address the sufficiency of service upon MediaServices in the first instance.

3  Of course, any alternate method of service "must ... comport with constitutional notions of due process," *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1016 (9th Cir.2002), which require "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Luessenhop v. Clinton County, New York,* 466 F.3d 259, 269 (2d Cir.2006) (citing *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)).

4  The Advisory Committee Notes include several examples of situations in which a district court would be justified in authorizing an alternate method of service. Two of these-the "refusal of the Central Authority to serve a complaint seeking punitive damages or to enforce the antitrust laws of the United States"-are highly instructive because they indicate that Rule 4(f) was not intended to burden plaintiffs with the sisyphean task of attempting service through the Hague Convention procedures when a member state has categorically refused to serve a particular type of complaint.

5  The Russian Federation has also formally objected to Article 10 of the Convention, thus precluding reliance on the three alternate service methods listed *supra* note 1. *See* Hague Conference on Private International Law, Status Table, Hague Service Convention, available at htt p://www.hcch.net/index_en.php?act=conventions.statusprint & cid=17 ("Service of documents by methods listed in Article 10 of the Convention is not permitted in the Russian Federation.").

6  In fact, the U.S. State Department has "informed the Russian Federation on numerous occasions that ... U.S. courts and litigants will explore other methods to effect service of process" and "advise[d] litigants that they may wish to seek guidance from legal counsel in the Russian Federation regarding alternative methods of service." *Id.*

7  Neither the Hague Service Convention nor apparently any other current international agreement between the United States and the Russian Federation prohibits service on a Russian defendant through service on his counsel in the United States. *See Forum Fin. Group, LLC v. President and Fellows of Harvard Coll.,* 199 F.R.D. 22, 24 (D.Me.2001); *Fridman,* 2007 WL 1515068, at *1. As the Supreme Court noted in *Schlunk,* the Hague Service Convention applies only where service must be accomplished by transmitting a judicial document to a defendant in a signatory country. *See Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 707 (1988); *see also* Fed.R.Civ.P. 4(f) Advisory Committee Notes to 1993 Amendments("Use of the Convention procedures, when available, is mandatory if documents must be transmitted abroad to effect service."). The Hague procedures carry no implications for valid service on a domestic agent. 486 U.S. at 707.

8  Plaintiffs have been diligent in apprising MediaServices of the pendency of this action. In December, 2006, a copy of the complaint was sent to John Kheit, a New York attorney who has publicly acknowledged his role as legal counsel to MediaServices and defended the company against allegations of copyright infringement. When Kheit indicated that he was not authorized to accept service, plaintiffs served MediaServices in accordance with Russian law governing service in a civil action before the Russian courts.

9  This pleading rule applies with equal force to plaintiffs' common law copyright and unfair competition claims. *See A.J. Sandy, Inc. v. Junior City, Inc.,* 36 Misc.2d 138, 140-41, 232 N.Y.S.2d 9, 12-13 (Sup.Ct.N.Y.Cty.1962), *aff'd* 17 A.D.2d 407, 234 N.Y.S.2d 508 (1st Dept.1962); *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano,* 331 F.Supp.2d 247, 255 (S.D.N.Y.2004).

10  *Plunket* did not, as the defendants suggest, hold to the contrary. In that case, the court noted that Plunket had not adequately pleaded ownership of the asserted copyrights or any infringing activities. *Plunket,* 2001 WL 175252, at *4-6. The *Plunket* court dismissed the complaint in its entirety because these deficiencies were common to all of the plaintiff's copyright claims, regardless of whether they were based on a protected work specified in the exhibits to the complaint. *Id.* at *6.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4104341
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

In re CATHODE RAY TUBE
(CRT) ANTITRUST LITIGATION.
Crago, Inc., Plaintiff,
v.
Chunghwa Picture Tubes, Ltd., et al., Defendants.

MDL No. 1917.   No. 07-5944 SC.   Sept. 3, 2008.

Opinion

*ORDER GRANTING INDIRECT PURCHASER
PLAINTIFFS' MOTION TO AUTHORIZE SERVICE
ON CERTAIN FOREIGN DEFENDANTS PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 4(F)(3)*

SAMUEL CONTI, District Judge.

**I. INTRODUCTION**

*\*1* This matter comes before the Court on the Indirect Purchaser Plaintiffs' Motion to Authorize Service on Certain Foreign Defendants Pursuant to Federal Rule of Civil Procedure 4(f)(3) ("Motion"). Docket No. 344. Defendants Koninklijke Philips Electronics N.V. ("Koninklijke") and Toshiba Corporation ("Toshiba") Opposed the Motion and Plaintiffs filed a Reply. Docket Nos. 354, 357, 363. The remaining Defendants affected by the Motion have agreed to accept service. *See* Docket Nos. 353, 356, 360, 361, 372. The matter was submitted to the Honorable Judge Legge, who has been appointed Special Master in this action. Judge Legge conducted a hearing and issued a Report and Recommendation regarding the Motion. Docket No. 373. After considering Judge Legge's Report and Recommendation of August 29, 2008, and after reviewing the parties' papers, this Court GRANTS Plaintiffs' Motion.

The Court merely notes that under Federal Rule of Civil Procedure 4(f)(3)[1] and the relevant caselaw, service on

foreign defendants, even those who are signatories to the Hague Convention, is proper under Rule 4(f)(3) where the foreign defendants have domestic subsidiaries and/or counsel and where service does not require transmittal abroad.[2] *See Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 707 (1988) (holding that the "only transmittal [of service] to which the [Hague] Convention applies is a transmittal abroad that is required as a necessary part of service").

In the present case, it is undisputed that both Koninklijke and Toshiba have domestic subsidiaries and domestic counsel. The Supreme Court has stated that "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the [Hague] Convention has no further implications." *Volkswagenwerk,* 486 U.S. at 707. This reasoning applies with equal force to service on a domestic agent under federal law. *See, e.g., In re LDK Solar Sec. Litig.,* C No. 07-5182, 2008 WL 2415186, at *3 (N.D. Cal. June 12, 2008) (stating "nothing in the [Hague] Convention bars the requested means of service" under Rule 4(f)(3) upon a domestic subsidiary). Defendants have provided no explanation for why transmittal abroad would be required in the present case, when federal law plainly permits service on Defendants' domestic subsidiaries or domestic counsel. *See Rio Prop., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1016 (9th Cir.2002) (holding that "[a]pplying th[e] proper construction of Rule 4(f)(3) ..., trial courts have authorized a wide variety of alternative methods of service including ... delivery to defendant's attorney"). Defendants' argument that service under Rule 4(f)(3) is somehow prohibited by the Hague Convention in the present circumstances is, accordingly, without support.

The Hague Convention applies only when transmittal abroad is required. Because Koninklijke and Toshiba have domestic subsidiaries and domestic counsel, transmittal abroad for service is not required. The Hague Convention therefore does not prohibit service on Defendants under Rule 4(f)(3).[3] Plaintiffs' Motion is GRANTED.

*\*2* The hearing on this Motion scheduled for Friday, September 5, 2008, is hereby VACATED.

IT IS SO ORDERED.

Footnotes

1    Rule 4(f)(3) states that "an individual ... may be served at a place not within any judicial district of the United States: ... by other means not prohibited by international agreements, as the court orders." Fed.R.Civ.P. 4(f)(3).

2    It is undisputed that both Defendants are foreign corporations located in countries that are signatories to the Hague Convention.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

3   For this reason, Defendants' reliance on a footnote from *Rio Properties* is misplaced. *See Rio Properties,* 284 F.3d at 1015 n. 4 (stating that a "federal court would be prohibited from issuing a Rule 4(f)(3) order in contravention of an international agreement, including the Hague Convention"). As the Hague Convention, for the reasons stated above, does not apply, this footnote is inapposite.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2415186
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

In re LDK SOLAR SECURITIES LITIGATION.
This Document Relates to: All Actions.

No. C 07–05182 WHA.    June 12, 2008.

Opinion

## ORDER GRANTING PLAINTIFFS' MOTION TO AUTHORIZE SERVICE TO UNSERVED DEFENDANTS LOCATED ABROAD AND VACATING HEARING

WILLIAM ALSUP, District Judge.

### INTRODUCTION

*1* In this federal securities class action, only four out of the ten defendants have been served. The remaining six defendants are located in China. Plaintiffs therefore move to authorize service on the unserved defendants located abroad pursuant to FRCP 4(f)(3). For the reasons stated below, the motion is **GRANTED.**

### STATEMENT

In March 2008, plaintiffs filed a consolidated class action complaint against corporation LDK, its two subsidiaries (one in China and one in the United States), and seven individual defendants. Plaintiffs alleged violations under various federal securities laws. Only LDK, LDK Solar USA, Inc. (LDK's United States subsidiary), chief executive officer Xiaofeng Peng, and chief financial officer Jack Lai have been served. The remaining six defendants who reside, work, and/or are located in China are: Jiangxi LDK Solar (LDK's Chinese subsidiary), president and chief operating officer Xingxue Tong, vice president and chief accounting officer Qiqiang Yao, executive vice president and board member Liangbao Zhu, senior vice president and board member Yonggang Shao, and non-executive director Gang Wang.

China is a party to the Hague Convention on the Service Abroad of Judicial and Extra–Judicial Documents in Civil or Commercial Matters. The provisions entered into force

between the United States and China in 1991. Pursuant to the Convention, service can be effected in China through the Chinese Central Authority. China, however, objected to Article 10 of the Convention, which stated:

> Provided the State of destination does not object, the present Convention shall not interfere with—
>
> a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
>
> b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
>
> c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163. Service therefore cannot be effected "by postal channels" or through the judicial officers, officials or other individuals of the state of destination. To date, plaintiffs have not tried to serve any of the unserved defendants through the Chinese Central Authority, claiming that the procedure is too time-consuming, costly, and potentially fruitless.

### ANALYSIS

FRCP 4(f) directs how to effect service on an individual in a foreign country. An individual may be served at a place not within any judicial district of the United States "by an internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." FRCP 4(f) (1). The rule further provides service "by any other means not prohibited by international agreement, as the court orders." FRCP 4(f) (3). Plaintiffs move for an order pursuant to FRCP 4(f)(3), permitting them to serve the six yet-unserved defendants through LDK's office, which is located in California. That way, plaintiffs say, the office can transmit the relevant documents to the unserved defendants, each of whom is a director, senior officer, or subsidiary of LDK.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

*2  The four defendants who have been served oppose this motion. They first argue that FRCP 4(f) requires plaintiffs to serve foreign defendants in accordance with "any internationally agreed means reasonably calculated to give notice," such as the Hague Service Convention. This is not true, as FRCP 4(f)(3) allows for an alternate means of service as long as it is directed by a court and not prohibited by international agreement. Significantly, FRCP 4(f)(3) stands independently of FRCP 4(f)(1); it is not necessary for plaintiffs to first attempt service through "internationally agreed means' before turning to "any other means not prohibited by international agreement." In *Rio Properties, Inc. v. Rio Intern. Interlink*, 284 F.3d 1007, 1014 (9th Cir.2002), the Ninth Circuit stated:

> By all indications, court-directed service under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2). Indeed, Rule 4(f)(3) is one of three separately numbered subsections in Rule 4(f), and each subsection is separated from the one previous merely by the simple conjunction "or." Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s other subsections; it stands independently, on equal footing. Moreover, no language in Rules 4(f)(1) or 4(f)(2) indicates their primacy, and certainly Rule 4(f)(3) includes no qualifiers or limitations which indicate its availability only after attempting service of process by other means.

* * *

The advisory committee notes ("advisory notes") bolster our analysis. Beyond stating that service ordered under Rule 4(f)(3) must comport with constitutional notions of due process and must not be prohibited by international agreement, the advisory notes indicate the availability of alternate service of process under Rule 4(f)(3) without first attempting service by other means. Specifically, the advisory notes suggest that in cases of "urgency," Rule 4(f)(3) may allow the district court to order a "special method of service," even if other methods of service remain incomplete or unattempted.

Consequently, plaintiffs are free to attempt an alternate means of service without having to show an attempt of service through the Chinese Central Authority—*assuming plaintiffs do not violate any international agreement.*

Defendants then contend that plaintiffs' requested form of service *does* violate an international agreement. The Ninth Circuit has held:

As obvious from its plain language, service under Rule 4(f)(3) must be (1) directed by the court; and (2) not prohibited by international agreement. No other limitations are evident from the text. In fact, as long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f) (3) may be accomplished in contravention of the laws of the foreign country.

*Rio Properties, Inc. v. Rio Intern. Interlink,* 284 F.3d 1007, 1014 (9th Cir.2002). Neither party disputes that China is a signatory to the Convention. As a signatory to the Convention, however, China explicitly objected to Article 10 of the Convention. Article 10 allowed for service "by postal channels" or through judicial officers, officials, or other persons in the state of destination.

*3  Defendants then say that the reasoning in *Agha v. Jacobs,* 2008 WL 2051061, *1 (N.D.Cal.2008) (Judge Seeborg), is instructive. There, the court denied plaintiff's request to serve the summons and complaint—via email or facsimile—to the defendants, who were located in the Federal Republic of Germany. Judge Seeborg rejected *Rio* because it "involved service in a country that is not a member of the Hague Convention." *Agha,* 2008 WL 2051061 at * 1 n .1. Like the situation in *Agha,* defendants say, the instant action involves a country that is a signatory to the Convention and that has objected to service by postal channels. *Rio* therefore does not apply.

Defendants' argument is unpersuasive. It is true that *Rio* involved a non-signatory country. Nonetheless, the Ninth Circuit's reasoning in the *Rio* decision is still applicable— as long as the service is "court-directed and not prohibited by an international agreement," service can be effected pursuant to FRCP 4(f)(3). *Rio,* 284 F.3d at 1014. Here, plaintiffs do not request to effect service in China via mail; rather, they request to serve the remaining six unserved defendants through LDK's California office. There is no service by postal channels, as was the case in *Agha* (where the judge concluded that service by email or facsimile was the functional equivalent of service by mail). Plaintiffs are therefore correct that nothing in the Convention bars the requested means of service.

Defendants further argue that plaintiffs must show that the signatory destination nation has refused to cooperate. "[A] plaintiff seeking relief under Rule 4(f)(3) must adequately support the request with affirmative evidence of the lack of judicial assistance by the host nation—conclusory assertions of the futility of Hague service are unavailing." *Arista*

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

*Records LLC v. Media Services LLC,* 2008 WL 563470, *1 (S.D.N.Y.2008) (Judge Buchwald). Because plaintiffs have not presented any facts indicating that China has refused to cooperate with the service provisions set forth in the Convention, the motion should be denied, defendants say.

Again, this argument has little merit. The Ninth Circuit held, "As obvious from its plain language, service under Rule 4(f)(3) must be (1) directed by the court; and (2) not prohibited by international agreement. *No other limitations are evident from the text." Rio,* 284 F.3d at 1014 (emphasis added). It is unnecessary for plaintiffs to show the lack of judicial assistance by the host nation. Instead, plaintiffs "needed only to demonstrate that the facts and circumstances of the present case necessitated the district court's intervention. Thus, when [the plaintiff] presented the district court with its inability to serve an elusive international defendant, striving to evade service of process, the district court properly exercised its discretionary powers to craft alternate means of service." *Id.* at 1016. In the instant action, plaintiffs have shown the difficulty of serving the unserved defendants located abroad. Defense counsel have refused to accept service on behalf of the unserved defendants on the ground that they do not represent the international defendants. (Yet, oddly, defense counsel oppose this motion on behalf of the unserved defendants.) According to the sworn declaration of plaintiffs' counsel, defense counsel has said that "it might be impossible to serve some of [the unserved defendants]" (Kaplan Decl. ¶ 3).

**\*4** Finally, the court-ordered method of service must still be reasonable. "Even if facially permitted by Rule 4(f)(3), a method of service of process must also comport with constitutional notions of due process. To meet this requirement, the method of service crafted by the district court must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Rio,* 284 F.3d at 1016. This order finds that the proposed form of service is constitutionally acceptable. Serving the remaining six defendants through the California office is reasonably calculated, under these circumstances, to apprise them of the pendency of the action and afford them with the opportunity to respond. After all, LDK trades on the New York Stock Exchange, its subsidiary is located in California, and the remaining defendants are all sophisticated officers, directors, or the Chinese subsidiary of LDK. Accordingly, plaintiffs' motion to authorize service to the unserved defendants abroad is granted.

## CONCLUSION

Because plaintiffs' requested form of service is not prohibited by international agreement, the motion authorizing service through LDK's California office to unserved defendants located abroad is **GRANTED.** Because a hearing is unnecessary, the hearing set for June 19, 2008, is **VACATED.**

**IT IS SO ORDERED.**

**End of Document**                                                                 © 2011 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4424789
Only the Westlaw citation is currently available.
United States Court of Appeals,
Seventh Circuit.

MINN–CHEM, INCORPORATED,
et al., Plaintiffs–Appellees,

v.

AGRIUM INCORPORATED,
et al., Defendants–Appellants.

No. 10–1712.    Argued June 3,
2010.    Decided Sept. 23, 2011.

**Synopsis**

**Background:** Direct and indirect buyers of potash products in United States brought antitrust class actions against Canadian, Russian, and Belarusian potash producers, alleging price fixing in violation of Sherman Act and state law. Actions were consolidated in multi-district litigation, and producers moved to dismiss. The United States District Court for the Northern District of Illinois, Ruben Castillo, J., 667 F.Supp.2d 907, granted motions in part and denied them in part, and certified its order for immediate appeal. Producers appealed.

**Holdings:** The Court of Appeals, Sykes, Circuit Judge, held that:

1 complaint failed to allege foreign anticompetitive conduct falling within exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach covering foreign anticompetitive conduct involving United States import trade or commerce, and

2 complaint failed to allege foreign anticompetitive conduct falling within FTAIA's exception covering conduct having direct, substantial, and reasonably foreseeable effect on domestic or import commerce.

Vacated and remanded with instructions.

West Headnotes (14)

**1**    **Antitrust and Trade Regulation**
    🔑 Cartels, Combinations, Contracts, and Conspiracies in General

Crucial question raised by restraint-of-trade claim under Sherman Act is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. Sherman Act, § 1, 15 U.S.C.A. § 1.

**2**    **Antitrust and Trade Regulation**
    🔑 Cartels, Combinations, Contracts, and Conspiracies in General
    **Antitrust and Trade Regulation**
    🔑 Conspiracy or Combination

Without more, parallel conduct does not suggest antitrust conspiracy, in violation of Sherman Act's restraint of trade provisions, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Sherman Act, § 1, 15 U.S.C.A. § 1.

**3**    **Antitrust and Trade Regulation**
    🔑 Conspiracy or Combination

When allegations of parallel conduct are set out to make restraint-of-trade claim under Sherman Act, they must be placed in a context that raises suggestion of preceding agreement, not merely parallel conduct that could just as well be independent action. Sherman Act, § 1, 15 U.S.C.A. § 1.

**4**    **Antitrust and Trade Regulation**
    🔑 What Law Governs

American antitrust laws do not regulate the competitive conditions of other nations' economies.

**5**    **Antitrust and Trade Regulation**
    🔑 Antitrust and Foreign Trade

Sherman Act reaches conduct outside United States's borders, but only when the conduct has an effect on United States commerce. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**6**    **Antitrust and Trade Regulation**
    🔑 Antitrust and Foreign Trade

Foreign Trade Antitrust Improvements Act (FTAIA) limits the Sherman Act's extraterritorial reach by making it generally inapplicable to foreign anticompetitive conduct, subject to certain enumerated exceptions. Sherman Act, § 7, 15 U.S.C.A. § 6a.

**7**   **Antitrust and Trade Regulation**
🔑 Antitrust and Foreign Trade

Allegations that foreign producers imported potash into United States and conspired to fix price of potash globally were insufficient to satisfy exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach for foreign anticompetitive conduct involving United States import trade or commerce, given absence of allegations of conduct directed at United States import market. Sherman Act, §§ 1, 7, 15 U.S.C.A. §§ 1, 6a.

**8**   **Antitrust and Trade Regulation**
🔑 Antitrust and Foreign Trade

Import-commerce exception established by Foreign Trade Antitrust Improvements Act (FTAIA) captures foreign anticompetitive conduct, thus bringing it back within the Sherman Act's reach, if the overseas anticompetitive conduct actually "involves" the United States import market. Sherman Act, § 7, 15 U.S.C.A. § 6a.

**9**   **Antitrust and Trade Regulation**
🔑 Antitrust and Foreign Trade

Direct-effects exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach captures foreign anticompetitive conduct that has a direct, substantial, and reasonably foreseeable effect on United States domestic or import commerce, regardless of whether the overseas anticompetitive conduct actually "involves" the United States import market. Sherman Act, § 7, 15 U.S.C.A. § 6a.

**10**   **Antitrust and Trade Regulation**
🔑 Antitrust and Foreign Trade

Relevant inquiry under exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach applicable to foreign anticompetitive conduct involving United States import trade or commerce is whether defendants' alleged anticompetitive behavior was directed at an import market; it is not enough that defendants are engaged in United States import market, although that may be relevant to analysis. Sherman Act, § 7, 15 U.S.C.A. § 6a.

**11**   **Antitrust and Trade Regulation**
🔑 Antitrust and Foreign Trade

Exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach for foreign anticompetitive conduct involving United States import trade or commerce requires that defendants' foreign anticompetitive conduct target United States import goods or services. Sherman Act, § 7, 15 U.S.C.A. § 6a.

**12**   **Antitrust and Trade Regulation**
🔑 Antitrust and Foreign Trade

**Antitrust and Trade Regulation**
🔑 Conspiracy or Combination

Complaint alleging global price-fixing conspiracy among foreign potash producers failed to allege foreign anticompetitive conduct falling within exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach applicable to foreign anticompetitive conduct involving United States import trade or commerce where complaint did not allege any specific facts to support plausible inference that producers agreed to price or production quota for potash for United States, that producers agreed to worldwide production quotas for all members of conspiracy, or that global cartel price was ever set, and instead described anticompetitive conduct aimed at potash markets in Brazil, China, and India

and only generally alleged conspiracy to fix price at which potash was sold in United States at artificially inflated and anticompetitive levels. Sherman Act, §§ 1, 7, 15 U.S.C.A. §§ 1, 6a.

13    **Antitrust and Trade Regulation**
☞ Antitrust and Foreign Trade

Effect is "direct," within meaning of exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach applicable to foreign anticompetitive conduct having direct, substantial, and reasonably foreseeable effect on domestic or import commerce, if effect follows as immediate consequence of defendant's activity, and cannot be "direct" where it depends on uncertain intervening developments. Sherman Act, § 7, 15 U.S.C.A. § 6a.

14    **Antitrust and Trade Regulation**
☞ Antitrust and Foreign Trade

**Antitrust and Trade Regulation**
☞ Conspiracy or Combination

Complaint alleging global price-fixing conspiracy among foreign potash producers failed to plead plausible direct, substantial, and reasonably foreseeable connection between alleged foreign anticompetitive activity and domestic potash market, and thus did not satisfy direct-effects exception to limitation, under Foreign Trade Antitrust Improvements Act (FTAIA), on Sherman Act's extraterritorial reach where complaint lacked sufficient factual description regarding way in which alleged cartelized prices in China, Brazil, and India markets served as benchmark for American prices, and thus did not permit plausible inference that anticompetitive conduct in those markets had requisite effect on prices in United States. Sherman Act, §§ 1, 7, 15 U.S.C.A. §§ 1, 6a.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 08 C 6910—Ruben Castillo, Judge.

**Attorneys and Law Firms**

J. Timothy Eaton, Attorney, Shefsky & Froelich, Steven A. Hart, Attorney, Segal, McCambridge, Singer & Mahoney, Chicago, IL, Bruce L. Simon, Attorney, Pearson Simon Warshaw & Penny LLP, San Francisco, CA, Beverly Tse, Attorney, Kirby McInerney & Squire, New York, NY, Bruce L. Simon, Attorney, for Plaintiffs–Appellees.

Richard Parker, O'Melveny & Myers LLP, Washington, DC, Stephen M. Shapiro, Attorney, Mayer Brown LLP, Brian J. Murray, Attorney, Jones Day, Duane M. Kelley, Attorney, Winston & Strawn LLP, Chicago, IL, Jeffrey L. Kessler, Attorney, Dewey & Leboeuf, Robert A. Milne, Attorney, White & Case, New York, NY, for Defendants–Appellants.

Before MANION, EVANS [*], and SYKES, Circuit Judges.

**Opinion**

SYKES, Circuit Judge.

**\*1** This multi-district antitrust class action alleges a global conspiracy to raise the price of potash, a mineral used primarily in agricultural fertilizer. Most of the world's potash reserves are concentrated in three countries—Canada, Russia, and Belarus—and the defendants are leading producers whose mining operations are located in those countries. The plaintiffs are direct and indirect potash purchasers in the United States. They allege that the Canadian, Russian, and Belarusian producers operated a cartel through which they fixed potash prices in Brazil, China, and India, and the inflated prices in these overseas markets in turn influenced the price of potash sold in the United States. The defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing first that the district court lacked subject-matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, and alternatively, that the complaint did not satisfy the pleading requirements of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* ⸺ U.S. ⸺, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The district court denied the motion but certified its order for immediate review. *See* 28 U.S.C. § 1292(b). We accepted review and now reverse.

As relevant here, the FTAIA limits the extraterritorial reach of the Sherman Antitrust Act to foreign anticompetitive conduct that either involves U.S. import commerce or has a "direct, substantial, and reasonably foreseeable effect" on U.S. import or domestic commerce. 15 U.S.C. § 6a. In *United Phosphorus, Ltd. v. Angus Chemical Co.,* 322 F.3d 942 (7th Cir.2003), we sat en banc to address whether the FTAIA's limitations are jurisdictional or instead are elements of a Sherman Act claim that implicates offshore anticompetitive conduct. We held that the FTAIA's requirements are jurisdictional. *Id.* at 950–52. A substantial minority of the court disagreed, *see id.* at 953–54 (Wood, J., dissenting), and the dissent's approach has since prevailed in the Supreme Court, although in decisions involving other statutes. *See Morrison v. Nat'l Austl. Bank,* ––– U.S. ––––, ––– – ––––, 130 S.Ct. 2869, 2876–77, 177 L.Ed.2d 535 (2010); *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 515–16, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). These intervening developments suggest that *United Phosphorus* may be ripe for reconsideration, but we need not undertake that task here. Whether it blocks jurisdiction or establishes an element of a Sherman Act claim, the FTAIA applies here to bar this antitrust suit. The defendants are entitled to dismissal under either Rule 12(b)(1) *or* 12(b)(6).

## I. Background

Two separate groups of plaintiffs filed nearly identical antitrust class actions against the world's leading potash producers. The first group—Minn-Chem, Inc.; Gage's Fertilizer and Grain, Inc .; Kraft Chemical Company; Shannon D. Flinn; Westside Forestry Services; and Thomasville Feed & Seed, Inc.—sued on behalf of themselves and all others who purchased potash products in the United States directly from the defendants. The second group—Kevin Gillespie, Gordon Tillman, Feyh Farms Company, William H. Coaker, Jr ., and David Baier —sued on behalf of themselves and all others who purchased potash products in the United States indirectly from the defendants.

*\*2* The defendants are seven companies whose principal mining operations are located in Canada, Russia, and Belarus, where most of the world's potash reserves are found: Agrium Inc., Potash Corporation of Saskatchewan Inc. ("PCS"), The Mosaic Company, JSC Uralkali, JSC Silvinit, JSC Belarusian Potash Company ("BPC"), and JSC International Potash Company ("IPC"). Agrium, PCS, and Mosaic operate potash mines in the Canadian province of Saskatchewan. These three

companies own Canpotex Ltd., a Canadian corporation that is named as a coconspirator but not as a defendant. Canpotex is a joint export marketing and distribution company tasked with coordinating the offshore sales of the potash supply of each of its three stakeholders. Canpotex is specifically structured to exclude the U.S. and Canadian markets. Export marketing through Canpotex is explicitly authorized and encouraged by Canadian law. In other words, Canpotex's coordination of Canadian potash exports is lawful under the domestic law of that country.

The remaining defendants conduct their mining operations in Russia and Belarus. Silvinit is a Russian company, and IPC is the exclusive international distributor of Silvinit's potash product. BPC is the exclusive international distributor for Uralkali (a Russian company headquartered in Moscow) and RUE PA Belaruskali. Uralkali and Belaruskali jointly own BPC. Belaruskali was initially named as a defendant, but because it is owned by the Republic of Belarus, it was dismissed from the suit under the Foreign Sovereign Immunities Act. *See* 28 U.S.C. §§ 1604 *et seq.*

We take the facts from the amended consolidated class-action complaint. The class period covered by the complaint is July 1, 2003, to the present. As of 2008 the named defendants accounted for roughly 71% of the world's potash supply. The complaint generally alleges a conspiracy to restrict output and fix prices of potash at artificially high levels in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] From 2003 to 2008, potash prices in the United States increased by a staggering amount—roughly 600%. This dramatic increase came after years of relatively stable pricing. The plaintiffs contend that the spike in prices cannot be explained by rising production costs or increased demand; indeed, they claim that demand was falling for much of this period. They also contend that the sharp increase in prices cannot be attributed to production shortages; the defendants are alleged to have plenty of excess capacity. The plaintiffs allege that the surge in prices was instead the result of an agreement by the defendants to jointly restrict output and increase prices as exemplified by parallel business conduct in three foreign markets—Brazil, China, and India.

The factual section of the complaint begins with a general description of the characteristics of the potash market, which the plaintiffs allege are conducive to forming a stable cartel. Potash is an element mined from naturally occurring ore deposits and used primarily as an ingredient in agricultural fertilizer. It is (for the most part) a homogeneous product, but only a handful of countries possess significant quantities

of this valuable resource. Accordingly, the potash industry is an oligopoly characterized by high market concentration. The Canadian province of Saskatchewan is the leading producer, accounting for roughly one-third of global production. Russia and Belarus are the next biggest exporters. Since potash accounts for a relatively small percentage of total crop-production costs and has no obvious substitutes, demand for the product is relatively inelastic, although not entirely so because farmers can opt to reduce the amount of fertilizer they use in a given season. Also, the majority of production costs for potash are variable rather than fixed; therefore, producers face less pressure in a given year to hit any particular output target in order to recoup their expenses. Finally, there are high barriers to entry into the potash business. In addition to first finding a promising source of potash deposits, any potential entrant would incur approximately $2.5 billion in start-up costs over a five-to-seven-year development period before production could commence.

 *3  With these background allegations in place, the complaint proceeds to explain that "the potash industry is marked by a high degree of cooperation" providing "opportunities to conspire and share information." In this regard, the complaint notes that PCS, Agrium, and Mosaic have access to one another's sensitive information about production capacity through their joint ownership of Canpotex. Canpotex also offers these three defendants a convenient forum to discuss matters of pricing and output. Moreover, Canpotex previously had a joint marketing agreement with Uralkali. The complaint also alleges that the interests of Uralkali and Silvinit are aligned because they share a common, influential shareholder, Dmitry Rybolovlev, who is alleged to own 66% of Uralkali and 20% of Silvinit's voting stock. The plaintiffs also allege that the defendants participate in an "exchange program of mutual visits" and "these visits have provided opportunities to conspire and exchange highly sensitive competitive information." Finally, the defendants meet together at the annual conference of the International Fertilizer Industry Association. The complaint alleges that the "major potash manufacturers" announced price increases during the Association's 2007 conference. Also, a PCS executive is alleged to have publicly complimented BPC (the Belarusian exporter) for showing "tremendous discipline ... in terms of managing supply in the marketplace."

From these allegations about general "opportunities to conspire" the complaint moves on to allege specific parallel business conduct consisting of reductions in output designed to keep prices artificially high and parallel increases in prices.

Some of these allegations are general and others specific to certain foreign markets. For example, the complaint alleges that as global demand for potash declined in the second half of 2005, the defendants "jointly restricted" the output of potash for the purpose of maintaining an artificially high price. In the last two months of 2005, PCS, the world's leading potash producer, announced the shutdown of three of its mines. These shutdowns resulted in the removal of 1.34 million tons of potash from the market. At the same time, Mosaic also announced a temporary, 200,000–ton reduction in potash production. Uralkali, Belaruskali, and Silvinit followed suit with reductions of their own in the first half of 2006. These production cuts continued through 2008 despite the fact that the defendants maintained sizeable excess capacity.

The complaint also points to an event in October of 2007, when Silvinit announced that a sinkhole at one of its mines might cause a long-term disruption in production at that location. Within a day of the announcement, PCS, Uralkali, Agrium, and BPC (but apparently not Mosaic) announced that they would suspend new sales in the wake of Silvinit's disclosure. Roughly two weeks later, Silvinit announced that the sinkhole was not as severe as initially feared and that the mine in question would return to business as usual. At this point the other companies ended their self-imposed moratorium on new sales. The complaint alleges that

 *4  [t]he joint suspension of sales by PCS, Uralkali, Agrium and BPC during the shutdown by Silvinit, a supposed competitor, makes no economic sense absent a cartel. Had the market truly been competitive, defendants would have the incentive to *increase,* not suspend, production to take advantage of their competitor's reduced output and thus gain market share.

The complaint's other factual allegations of parallel conduct focus exclusively on three foreign markets—Brazil, China, and India—giving examples of supply and pricing activity by the defendants beginning in 2003. For example, the complaint alleges that in "early 2003, IPC announced that it would increase its potash prices by eight dollars per ton. Within a month Canpotex announced that it would seek a nearly identical price increase for its sales in Brazil." Then, "[b]y mid–2003 all suppliers to Brazil were announcing that they had achieved an increase of eight dollars per ton." Later, in 2004, "IPC announced a price increase to buyers in India," and "[s]hortly after these announcements, PCS announced two five dollar per ton increases within a five week period." Other allegations focus on claimed coordination of supply restrictions in these countries. For example, the complaint

alleges that potash demand dropped by 20.9% in Brazil during 2005 and the Russian and Belarusian defendants reduced their combined exports to that country by the same percentage; Canpotex followed suit and cut its Brazilian exports "by almost exactly the same percentage." Plaintiffs also allege that Canpotex and BPC jointly restricted exports to China in an effort to boost the price of potash in that country.

Notably, all of the anticompetitive conduct identified in the complaint is alleged to have occurred outside the United States. The only link between the activities of this wholly foreign conspiracy and the U.S. potash market are general allegations that potash prices in the United States were adversely affected by the coordinated price hikes in Brazil, China, and India. That is, the complaint alleges that the cartelized prices in these foreign markets served as a "benchmark" for potash sales in this country.

The defendants moved to dismiss the Sherman Act claim pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction under the FTAIA and alternatively for failure to state a claim upon which relief can be granted. In a thorough opinion, the district court denied the motion but certified its order for immediate appeal under 28 U.S.C. § 1292(b).

## II. Discussion

As they did in the district court, the defendants make two arguments on appeal, one narrower and the other more broadly based. First, because the plaintiffs have alleged an offshore price-fixing conspiracy, the defendants argue that the FTAIA, 15 U.S.C. § 6a, deprives the court of subject-matter jurisdiction over this suit, requiring dismissal under Rule 12(b)(1). Alternatively, they argue that the complaint does not plausibly state an antitrust claim under the pleading standards announced in *Twombly* and *Iqbal* and must be dismissed under Rule 12(b)(6). The plaintiffs' complaint, they maintain, alleges at most only innocent parallel business conduct: "Even 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions,' is 'not in itself unlawful.' " *Twombly,* 550 U.S. at 553–54 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (alterations in *Twombly* )).

**\*5**  **1**  **2**  **3**   There may well be reason to doubt the complaint's sufficiency under *Twombly.*[2] The "crucial

question" in a Sherman Act § 1 claim "is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id.* at 553 (quotation marks omitted). "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556–57. The plaintiffs' complaint focuses mostly on allegations of parallel output and pricing conduct in the Brazilian, Chinese, and Indian potash markets; "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557; *see also In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 628–29 (7th Cir.2010) (describing the "kind of 'parallel plus' behavior" an antitrust plaintiff must allege to survive dismissal post-*Twombly* ).

But the threshold issue in this case concerns application of the FTAIA's limits on the Sherman Act's reach. On this point we agree with the defendants that the FTAIA requires dismissal; therefore, we need not decide the question of the broader sufficiency of the complaint under *Twombly* and *Iqbal.*

### A. The FTAIA and the Effect of *Arbaugh* and *Morrison* on *United Phosphorus*

**4**  **5**   It is well-understood that "American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce." *Id.* at 583 n. 6. Before the FTAIA was enacted, this domestic-effects limiting principle existed as a matter of caselaw. *See United Phosphorus,* 322 F.3d at 946–47. The FTAIA, adopted in 1982, incorporates the principle. More specifically, the FTAIA provides that the Sherman Act:

shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.    6

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under [the Sherman Act].

15 U.S.C. § 6a.

Though awkwardly phrased, "[t]he FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." *F. Hoffmann–La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 161, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004). The Act first states a broad general rule that the Sherman Act "shall not apply" to conduct involving foreign trade or commerce. It then carves out several exceptions. As relevant here, the FTAIA restores the Sherman Act's applicability to two categories of foreign anticompetitive conduct: (1) foreign anticompetitive conduct "involving ... [U.S.] import trade or import commerce"; and (2) foreign anticompetitive conduct that "has a direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import trade or commerce. 15 U.S.C. §§ 6a & 6a(1)(A).

**\*6** In *United Phosphorus,* this court sat en banc to consider whether the FTAIA is properly understood to create a jurisdictional requirement or, rather, an extra element of a Sherman Act claim when the plaintiff alleges a foreign antitrust conspiracy. 322 F.3d at 944. The court was closely divided on the question. Relying primarily on earlier opinions treating the statute's requirements as jurisdictional, the en banc majority held that the FTAIA has the status of a jurisdictional provision. *Id.* at 946–48. Judge Wood dissented, joined by three colleagues; her dissent focused on the text of the statute, which contained no "hint that the Congress was attempting to strip federal courts of their competence to hear and decide antitrust cases with a foreign element." *Id.* at 954 (Wood, J., dissenting). The dissent argued that the plain statutory language, which does not speak in jurisdictional terms, "supports the position that this is an element of the [Sherman Act] claim, especially when it is contrasted to true jurisdiction-stripping statutes." *Id.*

Subsequent Supreme Court decisions—notably *Arbaugh* and *Morrison*—have taken the dissent's approach to the question, although in different statutory contexts. *Arbaugh* addressed

whether the "numerical qualification contained in Title VII's definition of 'employer' affects federal-court subject-matter jurisdiction or, instead, delineates a substantive ingredient of a Title VII claim for relief." 546 U.S. at 503, 126 S.Ct. 1235. The Supreme Court concluded that this numerical threshold was not a requirement for subject-matter jurisdiction but, rather, was an element of a Title VII claim. *Id.* at 516. The Court explained that a statutory provision prescribing a "threshold limitation on a statute's scope" establishes a jurisdictional limitation only if the statutory text clearly says so:

If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character. Applying that readily administrable bright line to this case, we hold that the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue.

*Id.* at 515–16 (citation omitted).

In *Morrison* the Court considered the question of the extraterritorial reach of § 10(b) of the Securities and Exchange Act of 1934. 130 S.Ct. at 2875. The Second Circuit had treated this as a dispute over subject-matter jurisdiction to be decided under Rule 12(b)(1), but the Court made it clear it was a merits question. *Id.* at 2877. Noting that the Second Circuit was "hardly alone" in mischaracterizing the issue, the Court restated the question: "[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case." *Id.* (quotation marks omitted). Even so, because "nothing in the analysis of the courts below turned on the mistake," the Court said that remand was unnecessary; "a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion," so the Court proceeded to the merits question of whether the plaintiffs' allegations stated a claim. *Id.*

**\*7** We have recently applied *Arbaugh's* "clear statement" rule outside the Title VII context, *see Miller v. Herman,* 600 F.3d 726, 732 (7th Cir.2010), and the plaintiffs contend that the FTAIA should be subject to the same analysis. This calls *United Phosphorus* into question. The defendants' response is twofold. They first argue that *United Phosphorus* can be distinguished from *Arbaugh* based on the FTAIA's concern

for international comity; this argument is in tension with the Court's approach in *Morrison,* which also concerned a question of the extraterritorial reach of a federal statute. In the alternative, they argue that because the result is the same either way, we need not attempt to reconcile *United Phosphorus* with *Arbaugh* and *Morrison;* dismissal is required whether the FTAIA states a jurisdictional requirement, as *United Phosphorus* held, *or* an element of the Sherman Act claim.

We agree with the second of these arguments. As we have noted, in *Morrison* the Court found it unnecessary to order a remand to apply "a new Rule 12(b)(6) label [to] the same Rule 12(b)(1) conclusion." 130 S.Ct. at 2877. Here, the defendants moved to dismiss for lack of jurisdiction *and* failure to state a claim; our substantive review of the FTAIA is no different whether viewed through the lens of Rule 12(b)(1) or Rule 12(b)(6). For reasons we will explain, we conclude that the FTAIA bars this suit and therefore dismissal is required whether the statute is properly construed to state a jurisdictional requirement *or* an element of the plaintiffs' Sherman Act claim. Accordingly, we need not decide whether *United Phosphorus* survives *Arbaugh* and *Morrison.*[3] We note the issue and reserve it for another day.

### B. Applying the FTAIA's Requirements to the Plaintiffs' Complaint

  **6**   As we have explained, the FTAIA limits the Sherman Act's extraterritorial reach by making it generally inapplicable to foreign anticompetitive conduct, subject to certain enumerated exceptions. 15 U.S.C. § 6a. That is, the FTAIA "initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." *Empagran,* 542 U.S. at 162, 124 S.Ct. 2359. "It then brings such conduct back within the Sherman Act's reach," *id., if* the foreign anticompetitive conduct is "conduct involving ... import commerce" or has "a direct, substantial, and reasonably foreseeable effect" on domestic or import commerce, 15 U.S.C. § 6a. To determine whether the plaintiffs have done enough at the pleadings stage to bring their claim within either of these exceptions, we are required to evaluate their complaint in light of the "plausibility" pleading standard announced in *Twombly* and further explained in *Iqbal:*

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

  **\*8** *Iqbal,* 129 S.Ct. at 1949 (quotation marks and citations omitted).

*Twombly* explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. *Iqbal* reiterated this point: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 129 S.Ct. at 1949. Rather, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 1950. Accordingly, to avoid dismissal, the complaint must include sufficient factual content to support a plausible inference that the defendants' alleged anticompetitive activity —all of which occurred overseas—either "involv[ed] ... [U.S.] import trade or import commerce" or had a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce.

  **7**   The district court held that the plaintiffs had alleged enough to proceed on the basis of the "import commerce" exception and therefore did not address the "direct effects" exception. The court reasoned that because the defendants import potash into the United States and were generally accused of conspiring to fix the price of potash globally, there was a sufficiently "tight nexus between the alleged illegal conduct and [d]efendants' import activities ... to conclude that the former 'involved' the latter ." This was error. "The FTAIA differentiates between conduct that 'involves' ... [import] commerce, and conduct that 'directly, substantially, and foreseeably' affects such commerce. To give the latter provision meaning, the former must be given a relatively strict construction." *Carpet Group Int'l v. Oriental Rug Imps. Ass'n,* 227 F.3d 62, 72 (3d Cir.2000) *overruled on other grounds* in *Animal Sci. Prods., Inc. v. China Minmetals Corp.,* No. 10–2288, 2011 WL 3606995 (3d Cir. Aug.17, 2011).

The flaw in the district court's reasoning is that it essentially conflates the "import commerce" exception and the "direct effects" exception. If foreign anticompetitive conduct can

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

"involve" U.S. import commerce even if it is directed entirely at markets overseas, then the "direct effects" exception is effectively rendered meaningless. Under the district court's reading of the statute, a foreign company that does *any* import business in the United States would violate the Sherman Act whenever it entered into a joint-selling arrangement overseas *regardless* of its impact on the American market. This would produce the very interference with foreign economic activity that the FTAIA seeks to prevent. *See Empagran,* 542 U.S. at 161, 124 S.Ct. 2359.

**8**  **9**   As the Third Circuit has noted, the FTAIA's "import commerce" and "direct effects" exceptions are distinct and capture different kinds of foreign anticompetitive conduct. *See Turicentro, S.A. v. Am. Airlines Inc.,* 303 F.3d 293, 301–02 (3d Cir.2002) *overruled on other grounds* in *Animal Science,* 2011 WL 3606995. The import-commerce exception captures foreign anticompetitive conduct (thus bringing it back within the Sherman Act's reach) *if* the overseas anticompetitive conduct actually "involves" the U.S. import market. The direct-effects exception captures foreign anticompetitive conduct that has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce *regardless* of whether the overseas anticompetitive conduct actually "involves" the U.S. import market. *Id.*

**\*9**  **10**  **11**  **12**   Thus, the relevant inquiry under the import-commerce exception is "whether the defendants' alleged anticompetitive behavior 'was directed at an import market.' " *Animal Science,* 2011 WL 3606995, at \*5 (quoting *Turicentro,* 303 F.3d at 303). Contrary to what the district court seemed to think, it is not enough that the defendants are engaged in the U.S. import market, though that may be relevant to the analysis. *Id.* Rather, "the import trade or commerce exception requires that the defendants' [foreign anticompetitive] conduct target [U.S.] import goods or services." *Id.*

Here, the complaint contains no factual allegations to support application of the import-commerce exception, properly understood. It does not, for example, allege any specific facts to support a plausible inference that the offshore defendants agreed to an American price or production quota for potash. Nor does it allege, for that matter, that the defendants agreed to worldwide production quotas for all members of the conspiracy or that a global cartel price was ever set. The complaint's specific factual allegations describe anticompetitive conduct aimed at the potash markets in Brazil, China, and India—not the U.S. import market.

True, the complaint generally alleges that the "defendants conspired to coordinate potash prices and price increases so as to fix, raise, maintain, and stabilize the price at which potash was sold in the United States at artificially inflated and anticompetitive levels." But this wholly conclusory statement is akin to a recitation of the elements of the Sherman Act claim, which is insufficient under *Twombly* and *Iqbal.* We conclude that the complaint cannot survive dismissal based on the FTAIA's import-commerce exception and must stand or fall based on the direct-effects exception alone.

**13**  **14**   We have not yet had occasion to consider the meaning of the term "direct" in the FTAIA, [4] but the Ninth Circuit, relying on the Supreme Court's interpretation of a nearly identical term in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), has held that an effect is "direct" if "it follows as an immediate consequence of the defendant's activity." *United States v. LSL Biotechs.,* 379 F.3d 672, 680 (9th Cir.2004) (citing *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992)). "An effect cannot be 'direct' where it depends on ... uncertain intervening developments." *Id.* at 681. We find this definition compelling.

Despite its length and many specific factual allegations, the complaint offers very little of substance concerning the relationship between the defendants' alleged overseas anticompetitive conduct and the American domestic market for potash. Recall that the complaint builds its case for conspiracy around the characteristics of the potash industry that make it particularly susceptible to collusion. The complaint alleges, moreover, that the conspiracy was facilitated by the close working relationship among the Canadian defendants (via Canpotex) and among all the defendants through the International Fertilizer Industry Association and an "exchange program of mutual visits." Although the complaint describes in some detail certain parallel output and pricing conduct in the Brazilian, Chinese, and Indian markets, it does little to elaborate on how this conduct actually impacts the American potash market.

**\*10**   As we have noted, the complaint does not allege that the defendants agreed to worldwide production quotas or a global cartel price, nor are there allegations that the defendants ever imposed a price or supply quota on the American potash market specifically. In the section of the complaint entitled "Impact of Defendants' Conduct on United States Prices," the plaintiffs allege that "[t]he vast majority of potash sales in the United States are made by PCS, Mosaic, Agrium and BPC at prices that are set according to benchmarks established by

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

defendants based on sales in India, China and elsewhere." This is explained in slightly more detail elsewhere in this section of the complaint:

> Defendants negotiate term contracts for purchases of potash throughout the world. Agreements with buyers in Brazil, India and China typically are made first, and the prices established in those markets directly influence prices in other major markets. Once defendants establish these prices, they use them to determine potash prices in other major markets, including the United States. The prices for cartelized term contracts become benchmarks for spot market sales [including those in the United States], which typically are higher than those of term contracts.

The problem with these generalized allegations is the absence of specific factual content to support the asserted proposition that prices in China, India, and Brazil serve as a "benchmark" for prices in the United States and that this benchmark, if it exists, has a strong enough relationship with the domestic potash market to raise a plausible inference that the defendants' foreign anticompetitive conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic or import commerce. That is, the complaint only generally alludes to a link between the cartelized prices in these three foreign markets and American potash prices. Elsewhere in the complaint the plaintiffs do claim that:

> Through much of 2006, price increases were muted as purchasers awaited the outcome of negotiations over a proposed increase to customers in China. After potash producers reached an agreement on a price increase to customers in China in late July 2006, and Brazil later in 2006, potash prices in the United States increased as well, as defendants knew and intended.

But this general allegation does not add much. Prices of potash were increasing around the world throughout most of the class period. This allegation only hints at a relationship between Chinese and American prices; it does not suffice to raise a plausible inference that price increases in China or Brazil "directly" and "substantially" affected prices in the United States. Something more specific is required in order to successfully plead a "direct effects" case. To satisfy the requirements of *Twombly* and the FTAIA, the plaintiffs needed to provide enough factual content—that is, they needed to provide some factual description of the way in which prices in China, Brazil, and India serve as a "benchmark" for American prices—to permit a plausible inference that the defendants' anticompetitive conduct in

these foreign markets has a direct, substantial, and reasonably foreseeable effect on potash prices in the United States.

**\*11**   The "something more" is not supplied by the complaint's citation to a remark by one unnamed "analyst" who is alleged to have stated that "the barriers that we have seen in the past between domestic and international prices have just fallen down. We're now participating in a global fertilizer market." The allegation of a "global fertilizer market" is of course conclusory and unhelpful, and the complaint provides no context whatsoever for this statement that might make it more meaningful. In the end, the most specific allegation in the section of the complaint describing the impact of the defendants' overseas conduct on the American potash market is this one:

> Defendants knew and intended that their global conspiracy would directly impact prices of potash on world markets and within the United States. Representatives of Uralkali, in a presentation to analysts in December 2007, set forth each step in the chain of events resulting in increased prices throughout the world and in the United States: "[1] contract settlement in the key markets immediately tied up volumes of potash producers ... [2] causing demand competition on SPOT markets followed by increase in prices ... [3] conclusion of Indian contract on the back of the SPOT markets' growth—even less volume is available ... [4] boom on SPOT market continues stimulating increased Chinese discount and a stronger reason to bring it down in 2008."

This chain-of-events allegation is cryptic and relies on too many intervening variables to suffice as support for application of the FTAIA's direct-effects exception. Even taking into account "the nature of a global market," the allegations here amount to "nothing more than what courts have termed a 'ripple effect' on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such 'ripple effects.' " *In re Intel Corp. Microprocessor Antitrust Litig.,* 452 F.Supp.2d 555, 561 (D.Del.2006). Ultimately, the connection asserted in the complaint between the alleged cartelized prices of potash overseas and the domestic price of potash is too speculative and indirect to state an actionable claim under the FTAIA's direct-effects exception.

For all the foregoing reasons, we conclude that the complaint does not contain sufficient factual content to plead a plausible "direct, substantial, and reasonably foreseeable" connection between the alleged foreign anticompetitive activity and

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

the domestic potash market. Because the complaint fails to allege facts sufficient to satisfy the direct-effects exception of the FTAIA, dismissal is required. Accordingly, we vacate the district court's order denying the defendants' motion to dismiss and remand with instructions to dismiss the plaintiffs' Sherman Act claim.

VACATED AND REMANDED WITH INSTRUCTIONS.

### Footnotes

\*   Circuit Judge Terence T. Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

1   As we have noted, the direct and indirect purchasers asserted substantially identical claims under the Sherman Antitrust Act, 15 U .S.C. § 1. The indirect purchasers also asserted a host of state-law claims against the defendants; these claims are not before us on this interlocutory appeal.

2   Indeed, the Eighth Circuit, sitting en banc, rejected a very similar Sherman Act claim brought against the members of Canpotex, then comprised of a slightly different mix of principals, alleging a conspiracy to fix potash prices between 1987 and 1994. *See Blomkest Fertilizer, Inc. v. Potash Corp.,* 203 F.3d 1028, 1033–38 (8th Cir.2000). Although *Blomkest* was before the Eighth Circuit in a different procedural posture (the district court had entered summary judgment in favor of the defendants), the court's analysis of the adequacy of the plaintiffs' evidence of parallel conduct and interfirm communications in the potash industry supports the defendants' arguments here.

3   We note that the Third Circuit has recently applied the *Arbaugh* clear-statement rule, overruled circuit precedent, and held that the FTAIA does not impose a jurisdictional limit but instead establishes an element of a Sherman Act claim, citing with approval the *United Phosphorus* dissent. *Animal Sci. Prods., Inc. v. China Minmetals Corp.,* No. 10–2288, 2011 WL 3606995 (3d Cir. Aug.17, 2011).

4   In *Metallgesellschaft AG v. Sumitomo Corp. of America,* 325 F.3d 836, 842 (7th Cir.2003), we concluded that the plaintiffs had sufficiently alleged that the defendants' anticompetitive conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, but did not elaborate on the meaning of the word "direct." *Metallgesellschaft* involved allegations that the defendants had illegally manipulated the price of copper contracts traded on the London Metals Exchange. This conduct immediately and unavoidably increased the price at which copper was exchanged in the United States. Indeed, we pointedly observed that "[t]he plaintiffs before us have alleged more than a global conspiracy that has significant effects in the United States." *Id.*

**End of Document**                                   © 2011 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.                11

2007 WL 2295907
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

RSM PRODUCTION CORP., Jack J. Grynberg,
and Grynberg Petroleum Company, Plaintiffs,
v.
Mikhail FRIDMAN, Len Blavatnik, Lev
Korchagin and Gregory Bowen, Defendants.

No. 06 Civ. 11512(DLC).    Aug. 10, 2007.

**Attorneys and Law Firms**

Daniel L. Abrams, New York, NY, for Plaintiff.

Robert H. Pees, Akin Gump Strauss Hauer & Feld LLP, New York, NY, for Defendant Mikhail Fridman.

**Opinion**

***OPINION AND ORDER***

DENISE COTE, District Judge.

**\*1** Following a May 24, 2007 Memorandum Opinion and Order, *RSM Prod. Corp. v. Fridman,* No. 06 Civ. 11512(DLC), 2007 WL 1515068 (S.D.N .Y. May 24, 2007) ("May Opinion"),[1] granting in part plaintiffs' motion for court-directed service of process upon defendants Mikhail Fridman ("Fridman") and Lev Korchagin ("Korchagin") pursuant to Rule 4(f)(3), Fed.R.Civ.P. ("Rule 4(f) (3)"),[2] defendant Fridman brings this timely motion for reconsideration under Rule 6.3 of the Local Rules of Civil Procedure for the Southern District of New York. Fridman, a resident of the Russian Federation, seeks rescission of the Order granting permission to plaintiffs to serve him through his New York counsel. For the reasons that follow, the motion is denied.

**BACKGROUND**

On November 1, 2006, the plaintiffs brought the instant action against the defendants for tortious interference with business relations and tortious interference with a contract relating to the exploration and development of natural resources off the shore of Grenada. Defendant Fridman is the founder and chairman of the Alfa Group, a business conglomerate with significant interests in, among other things, the oil, banking, and telecommunications industries in the Russian Federation. *OAO Alfa Bank v. Ctr. for Pub. Integrity,* 387 F.Supp.2d 20, 25 (D.D.C.2005). Plaintiffs filed an Affidavit of Service on February 28, indicating that on February 21, Fridman was served through personal delivery of the case initiation documents to a suitable person at ALFA Capital Markets, a business located in New York and purportedly affiliated with Fridman. On March 13, Robert Pees ("Pees") entered a Notice of Appearance in this case on behalf of Fridman. That same day, Fridman moved to dismiss the complaint pursuant to Rules 4, 12(b)(2) and 12(b)(5), Fed.R.Civ.P., on the grounds that this service attempt was improper. Pursuant to a stipulation between the plaintiffs and Fridman, this Court struck both the February 28 Affidavit of Service and Fridman's motion to dismiss on April 5.

After plaintiffs moved on May 9 for court-directed alternate service of process on Fridman, the May Opinion granted plaintiffs permission to effect service through hand delivery of the relevant documents to Pees, Fridman's United States counsel, at the New York offices of Akin Gump Strauss Hauer and Feld LLP ("Akin Gump"), pursuant to Rule 4(f)(3). On May 25, the day after the May Opinion was issued, Fridman's counsel requested permission to file opposition papers to plaintiffs' motion for court-directed service. That same day, this Court ordered the submission of any opposition to the May Opinion in the form of a motion for reconsideration.[3] Defendant Fridman moved for reconsideration on May 29 and the motion was fully submitted on June 15.

**A. Fridman's Suit in the District of Columbia**

The relationship between Fridman and Akin Gump began years before Pees' notice of appearance in the instant litigation. From 2000 to 2006, Daniel Joseph and Tobias Eli Zimmerman of Akin Gump's Washington D.C. office represented Fridman as a plaintiff. On September 14, 2000, Fridman and his co-plaintiffs brought a defamation suit in the District of Columbia against a non-profit organization and its reporters for publishing an article alleging that the plaintiffs had connections to organized crime and had engaged in narcotics trafficking. *See OAO Alfa Bank,* 387 F.Supp.2d. 20. This litigation concluded last year with a grant of summary judgment for the defendants. *Id.* at 23.[4]

**B. The May Opinion**

**\*2** The May Opinion held that court-directed service pursuant to Rule 4(f)(3) on defendant Fridman was warranted

because plaintiffs had shown that they were unable to serve him in the Russian Federation pursuant to procedures set forth by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, [1969] 20 U.S.T. 361, T.I.A.S. No. 6638 ("Hague Service Convention"). May Opinion, at *1. It found that while "[s]ervice on a foreign defendant pursuant to the [Hague Service Convention] is mandatory when serving a defendant who resides in a foreign country that is a signatory to the convention," the plaintiff had submitted evidence showing that the Russian Federation's Central Authority is no longer processing service requests from the United States. *Id.* The May Opinion also found that "[n]either the Hague Service Convention nor apparently any other current international agreement between the [United States and the Russian Federation] prohibits service on a defendant residing in the Russian Federation through service on his counsel in the United States," and that such service was therefore permissible under Rule 4(f)(3). *Id.* at *2. Finding that such service would also not violate constitutional standards of due process, the May Opinion ordered service on Fridman through personal delivery on Pees in New York. *Id.*

**C. Motion for Reconsideration**

Fridman argues that the May Opinion erred for five main reasons. His first three complaints concern the May Opinion's treatment of the Hague Service Convention. Fridman argues that the May Opinion (1) expressed doubt as to the status of the Hague Service Convention, and thereby overlooked case law prohibiting courts from declaring that a treaty is not in force; (2) incorrectly relied on *Forum Fin. Group, LLC v. President & Fellows of Harvard Coll.,* 199 F.R.D. 22 (D.Me.2001), which was decided before Russia ratified the Hague Service Convention; and incorrectly interpreted the Hague Service Convention to permit service on a defendant residing in the Russian Federation through his United States counsel, when such service is barred by the Russian Federation's objections to Articles 8 and 10 of the convention. Fridman also complains that the May Opinion (4) did not acknowledge that Pees was not authorized to receive service on behalf of Fridman; and (5) contravened public policy by permitting service through counsel who appeared in the litigation for the sole purpose of contesting a previous attempt to serve the defendant.

**DISCUSSION**

The standard for a motion for reconsideration is strict, and "reconsideration will generally be denied unless the

moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Trans., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). Since Fridman was not heard prior to the issuance of the May Opinion, however, his arguments are granted due consideration here.

**A. Hague Service Convention**

*\*3* Two of Fridman's three criticisms of the May Opinion's treatment of the Hague Service Convention fail to point to controlling law or relevant data overlooked by the Court. Fridman first argues that "to the extent that the [May Opinion] expresses any doubt as to whether the Hague Convention is in force between the United States and Russia, ... it is clear that these doubts are unfounded and non-justiciable." The May Opinion noted that the plaintiff failed to address the current status of the Hague Service Convention. May Opinion, at *1 n. 1. This observation, however, did not purport to declare that the Hague Service Convention is no longer in force between the United States and the Russian Federation, and in no way intrudes on the political branches' role in dealing with the foreign relations of the United States. To the contrary, the May Opinion evaluated plaintiffs' requests for court-directed service with the understanding that the convention is currently in force.

Fridman's criticism that the May Opinion incorrectly relied on *Forum Fin. Group* similarly fails. The May Opinion explicitly acknowledged that this decision was issued before Russia joined the Hague Service Convention. May Opinion, at *2. *Forum Fin.* was offered to support the proposition that at the time of the decision in 2001, no international agreement between the United States and the Russian Federation prohibited service on a defendant residing in the Russian Federation through service on his United States counsel. The only international agreement that Fridman argues prohibits such service today is the Hague Service Convention. His criticism of this Court's reference to *Forum Fin. Group* therefore reduces to his third complaint, that the Hague Service Convention bars service upon a defendant residing in the Russian Federation through United States counsel due to the Russian Federation's objection to Articles 8 and 10 of the convention.

Fridman's third argument is unpersuasive. The Hague Service Convention does not prohibit an order pursuant to Rule 4(f)(3) permitting service through American counsel. The text of Rule 4(f) (3) limits a court's power to fashion a

method of service pursuant to the rule to any means "not prohibited by international agreement ." The Supreme Court has clarified, "the *only* transmittal to which the [Hague Service] Convention applies is a *transmittal abroad that is required* as a necessary part of service." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 707 (1988) (emphasis supplied). The Hague Service Convention has "no further implications," therefore, "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause." *Id.* Foreign nationals are assured under our nation's Due Process Clause "of either personal service, which typically will require service abroad and trigger the [Hague Service] Convention, or substituted service that provides notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 705 (citation omitted); *see also FMAC Loan Receivables v. Dagra,* 228 F.R.D. 531, 534 (E.D.Va.2005) (plaintiff's request for court-directed service on defendant through counsel in the United States pursuant to Rule 4(f) (3) did not implicate the convention because it involved no transmittal of documents abroad). [5] The Advisory Committee Notes to the sweeping amendments of Rule 4(f) in 1993 plainly contemplated alternative avenues of service when it noted that if the Hague Service Convention procedures are unavailable to a plaintiff, such as when a signatory state is "dilatory or refuse[s] to cooperate for substantive reasons," court-directed service pursuant to Rule 4(f)(3) may be available. Fed.R.Civ.P. 4(f)(1), advisory committee notes to the 1993 Amendment. *See* May Opinion, at *1.

 *\*4* Moreover, Fridman's reliance on Articles 8 and 10 of the Hague Service Convention provide him with no comfort. The Russian Federation's objections to Articles 8 and 10 signify only that the specific methods outlined in these provisions may not be used when effecting service through transmittal of judicial documents to a defendant *in* the Russian Federation. The text of the objections themselves suggest this interpretation. The Russian Federation's objection to Article 8 states, "Pursuant to Article 8 of the Convention, *diplomatic and consular agents of foreign States are not permitted to effect service of documents within the territory of the Russian Federation,* unless the document is to be served upon a national of the State in which the documents originate." Hague Conference on Private International Law, Status Table, Hague Service Convention, available at htt p://www.hcch.net/index_en.php? act=conventions.statusprint & cid=17 (emphasis supplied). Similarly, its objection to Article

10 sets forth that "[s]ervice of documents by *methods listed in Article 10 of the Convention* is not permitted in the Russian Federation." *Id.* (emphasis supplied). Article 10 of the convention permits service within the foreign country through the following three methods, barring any objection by the signatory state:

(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Hague Service Convention, art. 10. Neither Article 8 nor 10 addresses service on a defendant in the Russian Federation through alternate means in the forum state. Therefore, even if the Hague Service Convention applied, the Russian Federation's objections to Articles 8 and 10 do not prohibit this Court from granting plaintiffs permission to serve Fridman through Pees. *Accord* David D. Siegel, Supplementary Practice Commentary C4-24, 28 U.S.C.A. Fed.R.Civ.P. 4, at 73 (West Supp.2000) ("It is only a method barred by 'international agreement,' and presumably specifically barred by that agreement, that the court must stay away from.").

Thus, the May Opinion's direction remains appropriate. The Supreme Court has explained that "the core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States,* 517 U.S. 654, 672 (1996). Fridman's counsel does not contest that his client has notice of the instant litigation or that his client would be unable, if properly served, to litigate his defense. Indeed, such a contention would be suspect in light of Fridman's active litigation as a plaintiff in United States federal court. "[N]o one form of substitute service is favored over any other," and in fashioning substituted service on a defendant located abroad, a court should consider the "necessities" of a particular case. *Int'l Controls Corp. v. Vesco,* 593 F.2d 166, 176 (2d Cir.1979) (commenting on the predecessor to Rule 4(f)(3), former Rule 4(i)(1)(E), which provided for

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

service "as directed by order of the court" on a defendant located abroad). In this case, where plaintiffs have been unable, despite diligent efforts, to serve the defendant in the Russian Federation according to Hague Service Convention procedures, substituted service on Fridman through Pees accomplishes the goals of service while respecting the requirements of both due process and Rule 4(f)(3).

**\*5** Fridman has failed to present controlling law or relevant facts that suggest a different conclusion. His claim that "plaintiffs provide no basis for determining that service through Pees would comport with due process" other than "conclusory allegations that Mr. Fridman has 'actual notice' of this action," is unpersuasive. Fridman does not deny that he has already received actual notice of this suit. There is no reason, therefore, to conclude that service on Fridman through Pees would not provide him, as constitutional due process requires, "notice reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections." *Luessenhop v. Clinton County, N.Y.,* 466 F.3d 259, 269 (2d Cir.2006) (citing *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)); *see, e.g., Salomon Bros. Inc. v. Huitong Int'l Trust & Inv. Corp.,* No. 94 Civ. 8559(LAP), 1997 WL 324051, at \*3 (S.D.N.Y. June 13, 1997) (defendants' actual notice provided "proper grounds" to permit substituted service through defendant's counsel in the United States).

Fridman's resort to *Estate of Yaron Ungar v. Palestinian Auth.,* 412 F.Supp.2d 328 (S.D.N.Y.2006), and *Shenouda v. Mehanna,* 203 F.R.D. 166 (S.D.N.Y.2001), for the proposition that service may not be effected on him through means other than those set forth in the Hague Service Convention is similarly unconvincing. In neither instance did a plaintiff request court-directed service pursuant to Rule 4(f) (3).

In reply on the instant motion, Fridman claims that plaintiffs may not seek substituted service upon him through his domestic counsel under Rule 4(f)(3) since service effected through a domestic agent must be made pursuant to Rule 4(e)(2), Fed.R.Civ.P. ("Rule 4(e)(2)"). An argument first raised in reply may be ignored. *ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.,* 485 F.3d 85, 97 n. 12 (2d Cir.2007). In any event, Rule 4(e)(2), which permits service to be "effected in any judicial district of the United States" through "an agent authorized by appointment or by law," does not purport to be exclusive. Rule 4(f)(3) permits service to be effected on Fridman "in a place not within any

judicial district of the United States" through "means not prohibited by international agreement as may be directed by the court." Rule 4(f)(3) does not limit these means to the foreign transmittal of documents. Together, Rules 4(e) and 4(f) "provide[ ] for service on persons anywhere, subject to constitutional and statutory constraints." Rule 4(e), advisory committee notes to the 1993 Amendment.

Finally, Fridman contends that substituted service is not warranted because he has not sought to evade service. This argument is also unpersuasive, however, since he has not identified any requirement that a plaintiff demonstrate evasion by a defendant located abroad in order to secure substituted service pursuant to Rule 4(f)(3).

**\*6** Failing to identify any statutory or constitutional constraints on substituted service, Fridman has failed to show that reconsideration of the May Opinion is warranted. Substituted service on Pees is an appropriate means by which to serve Fridman within the requirements and circumstances of this particular case, where plaintiffs have been prevented from following Hague Service Convention procedures in the Russian Federation and the defendant not only has actual notice of the litigation, but has brought at least one lawsuit as a plaintiff in this country's federal courts.

**B. Authorization to Accept Service**

Fridman argues that service upon him through his attorney at Akin Gump would be improper because Pees is not his designated agent to receive service of process. "[S]ervice of process on an attorney not authorized to accept service for his client is ineffective." *Santos v. State Farm Fire & Cas. Co.,* 902 F.2d 1092, 1094 (2d Cir.1990). Fridman has failed, however, to provide controlling law demonstrating that in directing service pursuant to Rule 4(f)(3), a court may not authorize an attorney in the appropriate circumstance to receive service of process on behalf of a client located abroad. Court-ordered service on counsel made under Rule 4(f)(3) serves as effective authorization "by law" for counsel to receive service.

The cases cited by Fridman as authority for his position do not suggest otherwise, and indeed two support the substituted service ordered here. In *S.E.C. v. Unifund Sal,* 910 F.2d 1028 (2d Cir.1990), the Court of Appeals upheld service on a foreign defendant made through its American broker. *Id.* at 1034. In *Levin v. Ruby Trading Corp.,* 248 F.Supp. 537 (S.D.N.Y.1965), the Honorable Edward Weinfeld upheld substituted service on the foreign defendant through ordinary mail directed to the defendant as well as his attorneys in

Canada and the United States. *Id.* at 540. Finally, neither of the remaining cases on which Fridman relies involved a request for substituted service pursuant to Rule 4(f)(3). *Turick v. Yamaha Motor Corp., USA,* 121 F.R.D. 32 (S.D.N.Y.1988); *Gibbs v. Hawaiian Eugenia Corp.,* 581 F.Supp. 1269 (S.D.N .Y.1984).

## C. Public Policy Considerations

Fridman last argues that even if service upon him through Pees is permitted by law, as a matter of federal judicial policy, service of process pursuant to Rule 4(f)(3) through an attorney who has appeared only to challenge service of process and jurisdiction should not be allowed. It is

unnecessary to grapple with this last argument, since Akin Gump's relationship with Fridman is well established and extends beyond any limited appearance in this lawsuit. Akin Gump has assisted Fridman for years in pursuing litigation in another federal district court. Court-directed service on Fridman through Akin Gump does not contravene any federal judicial policy and Fridman has been unable to point to any authority suggesting that it does.

## CONCLUSION

**\*7**  Defendant Fridman's motion for reconsideration is denied.

SO ORDERED:

## Footnotes

1  Familiarity with the May Opinion is assumed.

2  Rule 4(f)(3) provides that service "may be effected in a place not within any judicial district of the United States ... by ... means not prohibited by international agreement as may be directed by the court." Rule 4(f)(3), Fed.R.Civ.P.

3  Fridman contends that he intended to respond to plaintiff's May 9 motion for alternate service within the ten days allowed by the Southern District of New York's Local Rule 6.1.(b) and Rules 5(b) (2)(D) and 6(e), Fed. R. of Civ. P. The May 9 motion was decided on the basis of plaintiff's submissions because the Court was unaware that Fridman intended to oppose the application.

4  Plaintiffs claim that Fridman has also been affiliated with other litigation in United States federal court including *Norex Petroleum Ltd. v. Access Indus., Inc.,* 416 F.3d 146 (2d Cir.2005), in which Akin Gump attorneys defended Alfa Group. Fridman was not, however, an individual defendant in *Norex.* He is a named defendant represented by attorneys from Akin Gump's Washington D.C. office in *IPOC Int'l Growth Fund, Ltd. v. Rozhektskin,* 06 Civ. 4338(VM), a case pending before the Honorable Victor Marrero of this Court, but has not been served in that case.

5  The Statement in the May Opinion that "[s]ervice on a foreign defendant pursuant to the [Hague Service Convention] is 'mandatory' when serving a defendant who resides in a foreign country that is a signatory to the convention" is correct only when service is effected on the foreign defendant by transmitting documents abroad to the signatory nation in which the defendant resides. *See* May Opinion, at \*1.

End of Document                                      © 2011 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.                    5

2011 WL 3156966
Only the Westlaw citation is currently available.
United States District Court,
D. Arizona.

XCENTRIC VENTURES, LLC, Plaintiff,

v.

KARSEN, LTD., et. al., Defendants.

No. CV 11–1055–PHX–FJM.   July 26, 2011.

**Attorneys and Law Firms**

David Scott Gingras, Gingras Law Office PLLC, Phoenix,
AZ, for Plaintiff.

**Opinion**

### ORDER

FREDERICK J. MARTONE, District Judge.

**\*1**  The court has before it plaintiff's motion to determine
sufficiency of service or for leave to perform alternative
service (doc. 6). Defendants have not responded or otherwise
appeared in the case.

Plaintiff moves for an order determining whether it has
effectively accomplished service of process on defendant
Karsen. Plaintiff is the operator of a consumer complaint
website. It discovered that a website owned and operated
by defendant allegedly contains certain copyrighted material.
Pursuant to the Digital Millennium Copyright Act, 17 U.S.C.
§ 512, et. seq., plaintiff sent a series of take-down notices
to non-party Google, Inc. to demand that Google remove the
infringing content from its search index and inform defendant
that it is infringing on plaintiff's copyrights. *See* § 512(c)(1)
(C). Google complied with the take-down notice. Pursuant
to the statutory scheme, defendant responded by serving
a counter-notice on Google to contest the accuracy of the
initial notice. To be effective, the counter-notice must contain
certain things including: "the subscriber's name, address,
and telephone number, and a statement that the subscriber
consents to the jurisdiction of the Federal District Court ...
and that the subscriber will accept service of process from
the person who provided notification under subsection (c)
(1)(C) or an agent of such person." § 512(g)(3)(D). Plaintiff
verified with Google that defendant expressly agreed to those
requirements. Plaintiff then instituted this action alleging

copyright and trademark infringement. *See* § 512(g)(2)(C)
(stating that unless a party files an action seeking a court
order to prohibit the infringing activity, the service provider
can restore the removed material). Plaintiff attempted to serve
defendant a copy of the summons and complaint via Federal
Express delivery to the address provided in St. Petersburg,
Russia and via email. Delivery at the Russian address was
unsuccessful because the address was "incorrect" according
to FedEx. On June 13, 2011, defendant emailed plaintiff in
response to plaintiff's emailed service of process. Defendant
generally objected to the lawsuit and included a response,
which it asked plaintiff to file with the court. In a later
email correspondence, defendant argued that it never waived
service of process and any service must be in compliance with
the Hague Service Convention.

It is clear to the court that defendant has notice of the lawsuit
and is evading service of process. By filing the counter-notice,
defendant expressly agreed to accept service of process at
its Russian address. Plaintiff attempted to perform service
there but was unsuccessful. Defendant also purports not
to understand the English language or the American court
system, yet it corresponds sufficiently in English and appears
capable of drafting a responsive pleading, as evidenced by
the response it emailed plaintiff. Plaintiff has made other
diligent, but unsuccessful, efforts to locate an alternative
mailing address. In the absence of a correct address, plaintiff
cannot personally serve defendant in Russia. It seems the only
medium effective at reaching defendant is email.

**\*2**  We cannot, however, find that plaintiff has already
accomplished service of process. While defendant did agree
to accept service of process when it filed the counter-
notice, plaintiff was unsuccessful in serving defendant by
conventional means at its Russian address. Service by
alternative methods, such as email, is only effective after
court approval. *See Rio Props., Inc. v. Rio Int'l. Interlink,* 284
F.3d 1007, 1018 (9th Cir.2002) (stating that email service is
not available absent a Fed R. Civ. P. 4(f)(3) court decree); *see
also* Fed.R.Civ.P. 4(h)(2) (authorizing service of process on
a foreign business in the manner prescribed by Rule 4(f)).

Therefore, we will grant plaintiff leave to serve defendant
via email. Service by email in circumstances where the
defendant is evading service of process and it is the only
method reasonably calculated to appraise defendant of the
pendency of the action is permissible. *See Rio Props.,* 284
F.3d at 1017 (approving an order granting leave to serve
by email under similar circumstances); *see also Liberty
Media Holdings, LLC v. Vingay.com,* No. CV11–0280–

PHX–LOA, 2011 WL 810250 (D.Ariz. March 3, 2011) (permitting service by email). Moreover, alternative methods of service in Russia, even those not required under the Hague Service Convention, are permissible, since Russia unilaterally suspended all judicial cooperation with the United States in 2003. *See Nuance Commc'ns., Inc. v. Abby Software,* 626 F.3d 1222, 1237–38 (9th Cir.2010) (holding that a district court erred in requiring service upon a Russian corporation to be in compliance with the Hague Service Convention). As the Ninth Circuit stated, "when faced with an international e-business scofflaw, playing hide-and-seek with the federal court, email may be the only means of effecting service of process." *Rio Props.,* 284 F.3d at 1018.

Therefore we **GRANT in part and DENY in part** plaintiff's motion (doc. 6). We **GRANT** plaintiff leave to serve defendant via email.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.